Roger MORRISON, et al., Appellants,

v.

BRANCH BANKING & TRUST COMPANY OF VIRGINIA, et al., Appellees.

Nos. 09–CV–708, 09–CV–709, 09–CV–710.

District of Columbia Court of Appeals.

Argued May 12, 2011.
Decided Aug. 4, 2011.

---

Roger Morrison, Washington, DC, for appellants.

Alan W. Margin, Bethesda, MD, for appellee Branch Banking and Trust Company of Virginia.

John E. Scheuermann for appellees Jeffrey Logan and Lena Bahn.

Before RUIZ and GLICKMAN, Associate Judges, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

These consolidated appeals, involving two separate rental properties (1822 and 1824 Lamont Street, N.W.), present questions of who may negotiate with an owner to purchase, or may match a third-party contract to purchase, a single-family and a two-four unit housing accommodation under the Tenant Opportunity to Purchase Act of 1980, D.C.Code §§ 42–3404.01 *et seq.* (2001) (TOPA or "the statute").

By an unconventional splitting arrangement, appellants Roger and Laurie Morrison attempted to buy both properties at issue. Laurie Morrison, as assignee of the rights of one or more of the individual residents of each property, sought to assert the right of first refusal conferred by the statute and thereby match a third-party contract-offer on each; while Roger Morrison, as assignee of the rights of the other individual tenant(s) of each property, attempted to buy the properties by accepting an original (and more favorable) offer of sale by the owner. Appellee Bank, on behalf of the Trust owning both properties, rejected all four of the Morrison offers, whereupon the Morrisons filed four separate lawsuits in Superior Court.

Following a trial, Judge Bartnoff granted judgment for appellees [1] after concluding that TOPA does not permit the exercise of tenant rights to purchase in the manner the Morrisons had pursued, whereby individual tenants of a rental unit—rather than the unit residents acting collectively, as a "household"—attempt to buy the housing accommodation, either themselves or through assignees.

On appeal, the Morrisons contend that the trial judge erred in not ruling that the Bank was obliged to accept Laurie Morrison's offer to purchase both properties on terms matching the third-party contract-offers. Separately, they argue that the Bank violated TOPA by not offering them a right of first refusal on a later third-party contract to buy the second of the two properties, after the first contract-offer on that property had lapsed.

We hold, in accordance with the trial judge's ruling, that the Bank properly rejected the offer by Laurie Morrison to purchase the property at 1822 Lamont Street, N.W., although our reasoning differs somewhat from the judge's. The issue of whether the Bank rightly refused Laurie Morrison's offer to match the original third-party contract on the 1824 Lamont Street property is a closer one, but we do not decide it because we find merit in the Morrisons' separate argument that the Bank failed to honor their TOPA rights with respect to the later third-party contract-offer. We therefore affirm in part and reverse in part.

## I.

## BACKGROUND

### A.

At the relevant times, the two properties in question, located at 1822 Lamont Street,

---

1. The other appellees, Jeffrey Logan and Lena Bahn, are the third-party contract purchasers of one of the two properties.

N.W. and 1824 Lamont Street, N.W., were owned by the Marian A.W. Morrison Revocable Living Trust, for whom appellee Branch Banking and Trust Company of Virginia (hereafter "The Bank") served as the trustee. Appellant Roger Morrison is one of the sons of the late Marian Morrison and is a beneficiary of the Marian A.W. Morrison Revocable Living Trust, along with his two siblings; Mr. Morrison has long served as the manager of both Lamont Street properties.

Under the District's rental laws, the property at 1822 Lamont Street, N.W. was classified as a single-family accommodation occupied by a group of seven individuals identifying themselves as "the Lamont Street Collective." The property at 1824 Lamont Street, N.W. was a two-unit accommodation: the upstairs portion of the house was occupied by six individuals, and the downstairs portion was occupied by Fernando and Martha Peredo.

On October 10, 2001, Michael Patterson of McEnearney Associates, an agent of the Bank, sent a letter to each of the residents of 1822 Lamont, the single-family accommodation, notifying them that the owner was offering the property for sale and enclosing an offer of sale for the purchase price of $459,900. A similar letter of October 15 was sent to the residents of 1824 Lamont, the two-unit accommodation, along with an offer of sale for the price of $479,000. On November 7, thirty days after receiving notice of the owner's intent to sell the 1822 dwelling, the tenant John Archer responded in writing to Patterson that the Lamont Street Collective intended to exercise its TOPA right to purchase the property. Fifty-six days later, however, Archer sent another letter to Bank officials stating that he wished to inform "that I

and/or Lamont Street Collective do not wish to make an offer on the house at 1822 Lamont Street, N.W., Washington, DC at this time, but we wish to reserve our option for a later date." Thereafter, the 1822 Lamont dwelling was marketed for sale and on January 18, 2002, the Bank ratified a contract for appellees Logan and Bahn to buy the property for $531,000.[2] Pursuant to TOPA, the members of the Lamont Street Collective were provided with a right of first refusal notice advising them of the existence of a third-party contract and of their right to match it. John Archer signed an acknowledgment of receipt of the notice on behalf of the Collective on January 20, 2002.

The tenants of 1824 Lamont also responded to the notice of intent to sell. On October 30, 2001, fifteen days after receiving the Bank's notice of intent to sell, Allison Shelley, a resident of the upstairs unit at 1824, sent a notice to Patterson stating that she wished to exercise her TOPA right to buy the property and was acting on behalf of all of the residents of the upper unit of 1824 Lamont Street. Martha and Fernando Peredo, who occupied the downstairs apartment, sent no such notice. On January 24, 2002, Jeff Lloyd, a third party, made an offer to purchase the 1824 (two-unit) accommodation for $550,000, and the Bank sent notices of first refusal to the tenants dated January 28, 2002. The Lloyd contract was terminated in early 2003. On April 16, 2003, Christopher Harrison submitted a contract to buy the property for $450,000, and the Bank accepted that contract on April 18, 2003. No further TOPA notice was sent to the tenants of 1824 Lamont.

**2.** The contract of sale stated that if the tenants of the property elected to exercise their right to purchase the property under TOPA, the purchasers could void the contract and obtain the full return of their earnest money deposit.

Meanwhile, in January of 2002, appellants Roger and Laurie Morrison had begun acquiring the TOPA rights of the tenants of the two Lamont Street properties by assignment. Rather than attempt to gather and assert these rights as a bundle, however, the Morrisons pursued a bifurcated strategy: Laurie Morrison acquired all of the TOPA rights of one or more of the individual residents of each property, and attempted to assert a right of first refusal as to each property. Roger Morrison acquired the rights of the other individual residents of each property, and attempted to buy both properties under the original (and more favorable) offers of sale.

With regard to the 1822 (single-family) Lamont property, Laurie Morrison asserted the TOPA first-refusal rights of John Archer (acquired by assignment on January 28, 2002) by submitting a proposed contract to buy the property on terms matching the offer of sale made by Logan and Bahn. As to the 1824 Lamont property, Laurie Morrison asserted the TOPA first-refusal rights of Allison Shelley and the upstairs residents of 1824 (assigned January 30, 2002), along with the first-refusal rights of Martha Peredo (assigned February 2, 2002),[3] by submitting a proposed contract matching the Lloyd offer on the property.

At about the same time, Roger Morrison, who had acquired the TOPA rights of the remaining six unnamed members of the Lamont Street Collective (assigned January 27, 2002), and the rights of Fernando Peredo (assigned January 21, 2002),[4] attempted to assert Mr. Peredo's right to purchase the 1824 (two-unit) Lamont Street dwelling. Roger Morrison also attempted to assert the rights of the six residents of the Lamont Street Collective by submitting a proposed contract to purchase the 1822 (single-family) Lamont dwelling for $459,900, the price of the original offer of sale. The Bank refused to accept any of the four offers to purchase submitted by the Morrisons.

In early 2003, Jeff Lloyd terminated his contract to buy 1824 Lamont Street, and in April of that year Christopher Harrison submitted a contract to purchase the same property. The Bank did not give the Morrisons notice of their opportunity to match the contract, and instead accepted it.

**B.**

The Morrisons filed four lawsuits in Superior Court seeking to enforce their TOPA rights. Laurie Morrison's suit named the Bank as the defendant, and Roger filed three additional suits against the Bank or its agents as well as against Christopher Harrison and Mr. Logan/Ms. Bahn. Roger Morrison also filed a *lis pendens* against each of the two properties giving notice that his suits were pending. *See* D.C.Code § 42–1207 (2001). Harrison in turn sued for specific performance of his contract to buy 1824 Lamont Street, but his suit was dismissed with prejudice.

Judge Bartnoff rejected all of the Morrisons' claims in an opinion issued March 16, 2009, concluding that the Bank was not required to honor any of their contract-offers. She ruled that both of Roger Morrison's offers fell outside the requisite stat-

---

**3.** Martha Peredo had first assigned her TOPA rights to Roger Morrison, but he released Ms. Peredo from that assignment on February 2, 2002, in a letter stating that this was being done so that Ms. Peredo could re-assign her rights to Roger's wife Laurie Morrison. Ms. Peredo executed a document assigning her rights to Laurie Morrison on February 2, 2002.

**4.** As noted above, Roger Morrison had originally been assigned the rights of both Peredos, but released Ms. Peredo from that assignment on February 2, 2002.

utory periods for responding to the notice and offer of sale and for negotiating a contract. As to Laurie Morrison's offers, the judge ruled that TOPA does not require an owner to accept a tenant-offer consisting of an offer by fewer than all of the tenants of one rental unit. Rather, she reasoned that each unit represents a household for the purposes of negotiating under TOPA, and that the owner is required to negotiate only where (1) all of the individuals within the unit have acted collectively to submit a single offer, or (2) one or more have chosen to submit an offer while the remaining tenants have "indicated that they were not interested in purchasing the property." Judge Bartnoff found that each of Laurie Morrison's offers was invalid because it purported to represent the interests of a single individual from a rental unit that contained multiple individuals.

## II.

## ANALYSIS

### A.

■ TOPA, as this court has explained, extends a panoply of rights to a residential tenant whose landlord proposes to sell the property or discontinue its use as rental housing. The landlord must give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale. The landlord and tenant must bargain in good faith and the negotiations must be given a reasonable period in which to reach fruition. The tenant also has a right of first refusal on any

sale contract the landlord negotiates with a third party.
*1836 S Street Tenants Ass'n, Inc. v. Estate of B. Battle,* 965 A.2d 832, 838 (D.C.2009) (footnotes and internal quotation marks omitted). Tenant rights under TOPA may be broadly assigned. D.C.Code § 42–3404.06.

■ The basic question posed by these appeals, involving residents (or their assignees) of a "single-family accommodation," D.C.Code § 42–3404.09 (1822 Lamont), and of an "accommodation[ ] with 2 through 4 units," § 42–3404.10 (1824 Lamont), is who may assert the rights extended by TOPA. The Morrisons argue, as they did in the trial court, that any resident of a rental unit [5] meeting the broad definition of a "tenant" [6] may exercise the opportunity to purchase or negotiate, even in the face of competing offers by other tenants of the same unit. Otherwise, they say, "a single individual [would be allowed] to veto the wishes of other tenants" in the unit (Br. for Appellants at 14), contrary to a basic purpose of TOPA to strengthen the rights of tenants and prevent their displacement. *See generally* D.C.Code § 42–3401.02 ("Purposes"). For example, they point to the statute's requirement that "each tenant" be given a copy of the offer of sale by the owner, D.C.Code § 42–3404.03, and its use of the terms "tenant" and "individual" interchangeably at places, as in § 42–3401.03(9) (defining "head of household")—all of which, they say, bespeaks the legislature's intent for "each individual of several living together in a single-family unit" to be able to exercise (themselves or through assignees) TOPA rights, whether or not in competition.

---

**5.** A " 'rental unit' means ... that part of a housing accommodation which is rented or offered for rent for residential occupancy." D.C.Code § 42–3401.03(16).

**6.** " 'Tenant' means a tenant, subtenant, lessee, sublessee, or other person entitled to the possession, occupancy or benefits of a rental unit.... The singular term 'tenant' includes the plural." D.C.Code § 42–3401.03(17).

Thus it is of no account, the Morrisons argue, that Laurie Morrison as assignee of the rights of one or more (but not all) tenants of 1822 and 1824 Lamont exercised the right of first refusal, while Roger, assigned the rights of others of the same single-family accommodation or rental unit, asserted the right to match the Bank's original offer of sale on more favorable terms. However, our reading of the language and structure of the relevant TOPA provisions as a whole refutes this argument.

Exactly how tenant rights are exercised under the statute differs depending on the type of housing accommodation involved. Of immediate relevance, for a "single-family accommodation" TOPA states that "[u]pon receipt of a written offer of sale from the owner . . . the tenant shall have 30 days to provide the owner . . . with a written statement of interest." D.C.Code § 42–3404.09(1). If the tenant declares that interest, "the owner shall afford the tenant a reasonable period"—not less than 60 additional days—"to negotiate a contract of sale," and similarly "shall afford the tenant a reasonable period prior to settlement to secure financing" if the parties reach contract. In our view, the rubric "*single*-family accommodation[ ]," the repeated statutory reference to "*the* tenant," and the statute's similar reference to a single "statement of interest" all imply strongly that the owner's obligation is to negotiate just once regarding the sale offer, not with multiple tenants of the dwelling each offering to purchase—a reading bolstered further by the definition of "tenant" as "includ[ing] the plural." See note 6, *supra*.

Moreover, when TOPA's drafters wanted to allow multiple and competing tenant offers for the same housing accommodation they did so expressly, in the case of "accommodations with 2 through 4 units."

D.C.Code § 42–3404.10. That section, contemplating as many as four such offers by individual tenants, begins by stating that "[t]he tenants may respond to an owner's offer first jointly, then severally." *Id.* at § 42–3404.10(1). It goes on to say that if "a group of tenants acting jointly" has not provided a written statement of interest within five days, then "an individual tenant" has seven days in which to state that interest. *Id.* In either case, the owner must afford the tenants—acting individually or jointly—"a reasonable period" of not less than ninety days "to negotiate a contract of sale"; and if more than one individual tenant is interested, "the owner shall negotiate with each tenant separately, or jointly if the tenants agree to negotiate jointly." *Id.* at § 42–3404.10(2)(A). But if, in the end, "the owner is required to negotiate with more than one [individual] tenant . . . the owner may decide which contract is more favorable without liability to the other tenants." *Id.* at § 42–3404.10(2)(C). This elaborate, carefully-structured scheme for tenant purchase of two-four unit accommodations, requiring first collective action but then preserving the ability of tenants to compete unit-by-unit while retaining the owner's discretion to choose among offers to buy, see *Medrano v. Osterman*, 885 A.2d 310, 314 (D.C. 2005), would be unnecessary if the Morrisons were correct that TOPA broadly contemplates, as to both single-family and two-four unit housing accommodations, the exercise of competing rights to negotiate and purchase by tenants.

Relevant finally to judging the correctness of appellants' reading of TOPA is § 42.3404.11, which governs "accommodations with 5 or more units." That section precludes any action at all by individual tenants "to buy from the owner," instead requiring tenants wishing to purchase to "form a tenant organization . . . represent[ing] at least a majority of the occu-

pied rental units...." *Id.* § 42.3404.11(1)(A) & (C). This organization, "constitut[ing] the sole representative of the tenants," *id.* at § 42–3404.11(C), is allowed specified periods of time in which to negotiate a sales contract and secure financing. *Id.* at § 42–3404.11(2) & (3). The drafters of a statute barring the exercise of individual tenant rights to buy properties housing more than four rental units would surely have been circumspect in allowing tenants of smaller accommodations to submit competing offers to purchase. Yet the Morrisons' position, followed to its extreme, would mean that each one of multiple residents of all units in a four-unit dwelling could negotiate in response to a sale-offer, even though by the addition of just one more rental unit to the calculus no individual tenant action at all would be allowed. That is not a sensible reading of the statute, any more than is one allowing tenants of a single-family accommodation to submit multiple competing offers to purchase the unit. Both run counter to a statute meant to ensure tenant rights to purchase, but at the same time limit the number of tenants with whom an owner selling an accommodation must negotiate.

The proper understanding of TOPA as a whole, we conclude, is that an owner must entertain only one tenant-offer to buy a single-family accommodation, one tenant-offer from each rental unit to buy a two-four unit accommodation, and one tenant-offer, made collectively through a tenant organization, to buy an accommodation housing more than four rental units. The Morrisons' contrary argument that TOPA allows an indefinite and potentially sizea-ble number of competing tenant-offers to "bloom" in the case of single-family or two-four unit accommodations has no substantial support in the statute's language or structure.

Judge Bartnoff, however, went a step further than we have in her reading of how the statute limits the manner in which tenant rights to purchase may be exercised. She concluded that TOPA requires the tenants of any rental unit—not just in properties with more than four rental units—to exercise purchase rights as a "household," meaning that they must do so collectively even as to single-family and two-four unit accommodations. The judge pointed out, for example, that the statute at the relevant time defined a "household" as "all of the persons living in a rental unit," § 42–3401.03(10),[7] and that its definition of "head of household" includes a provision allowing the tenants of a unit to "designate one of themselves as the head of household," § 42–3401.03(9), which for the judge was evidence that tenants (or their assignees) who are part of a single rental unit may "not exercise their TOPA rights separately" but instead must "act collectively through a designated representative."

This is not an unreasonable reading of the statute, but it is not compelled. It has the advantage of establishing near-uniformity in the way tenant rights to buy are exercised among the housing accommodations of different size. And, although the statute does not define a "single-family accommodation," standard commercial glossaries define a dwelling of that kind as a "household" or place accommodating a household,[8] a term collective in meaning.

---

7. That definition has since been deleted by the Housing Regulation Administrative Amendment Act of 2008, D.C. Law 17–366, effective March 25, 2009.

8. *See single-family dwelling: Definition From Answers.com*, ANSWERS.COM, http://www.answers.com/topic/single-family-dwelling (last visited July 8, 2011) (a "single-family dwelling is a residence housing one family or house-

Yet, neither "household" nor "head of household" appears as a term in the operative provisions dealing with single-family or two-four unit accommodations, and Judge Bartnoff herself recognized that to require collective action (if at all) by tenants of those accommodations could be more inflexible a process than TOPA demands in a hypothetical case where one unit member wants to buy but the others (in her words) have "indicated that they [are] not interested in purchasing the property." Bearing in mind that TOPA favors "resolution of ambiguity," including statutory ambiguity, "toward the end of strengthening the legal rights of tenants," § 42–3405.11, we believe that the provisions governing single-family and two-four unit accommodations do not restrict the assertion of tenant purchase rights to *collective* action through a household or head of household, but that they bar the exercise of *competing* rights to purchase by tenants of the same rental unit. That reading leaves it up to the residents themselves to determine how to submit an offer as a "tenant," while insuring that an owner will have to negotiate with, or entertain an offer to match a third-party contract from, only a single tenant of a rental unit in a single-family or two-four unit accommodation.

### B.

■ Applying this standard, we hold that the Bank was not required to accept

Laurie Morrison's offer to buy the 1822 Lamont Street accommodation over the third-party contract-offer of Logan/Bahn. On February 3, 2002, Laurie Morrison asserted the (assigned) TOPA first-refusal rights of tenant John Archer to match the Logan/Bahn offer to buy 1822 Lamont for $531,000. Meanwhile, on January 31, Roger Morrison, assignee of the rights of the remaining six tenants of that single-family residence, had submitted a proposed contract to buy the same property for $459,000, the terms of the Bank's original sale-offer. When the Bank rejected his offer, Roger, on February 4, filed suit against (*inter alia*) the Bank officials and simultaneously filed a notice of *lis pendens* against the 1822 Lamont property.[9] Thus, virtually at the same time Laurie asserted her assigned TOPA right, the Bank was confronted with two competing attempts to buy 1822 Lamont—at very different prices—from assignees of tenants of the same single-family accommodation. Although in retrospect the Bank had sound reasons to reject Roger's effort to match the original sale offer, he contemporaneously served notice of his intent to challenge those reasons—or defenses—by his lawsuit and *lis pendens* filing which effectively barred any transfer of the property during the litigation. This simultaneous assertion of conflicting rights to purchase by tenants or their assignees of a single rental unit was sufficient reason under

hold") (citing Barron's Marketing dictionary); *single-family dwelling definition*, AllBusiness.com, http://www.allbusiness.com/glossaries/single–family–dwelling/4964265–1.html (last visited June 23, 2011) (same definition).

9. Roger's lawsuit embraced both properties, 1822 and 1824 Lamont (see discussion in text, *infra*). It alleged various defects in the notice to purchase which the Bank had given the tenants of each property, including "false representations" designed to cause them to forfeit their TOPA rights. For this "pre-existing scheme and artifice to defraud the tenants and their assignee, Roger Morrison," the complaint demanded that the notices be deemed "of no independent force or effect" and sought (among other things) compensatory damages for loss of the opportunity to buy both properties and punitive damages for conduct meant to "willfully and maliciously injur[e] the tenants … and their assignee, Roger Morrison."

TOPA for the Bank to reject both Morrison offer to buy 1822 Lamont.

Laurie Morrison's proposed contract matching the Lloyd third-party contract on 1824 Lamont was similarly defective. On February 12, 2002, she submitted an offer matching the Lloyd contract (with a price of $550,000) on behalf of the assigned first-refusal rights of all the upstairs-unit tenants *and* the same rights of Martha Peredo, one of the two tenants of the downstairs rental unit. Meanwhile, on January 24, 2002 (the same date as the Lloyd contract-offer), Roger Morrison as assignee of Fernando Peredo's rights had made an offer to buy the property for $479,900, matching the Bank's original offer; and when the Bank rejected that offer Roger filed the above-mentioned suit on February 4—eight days before Laurie's offer to match—as well as a *lis pendens* notice challenging the Bank's refusal to honor his TOPA rights. The Bank thus appeared to face competing, litigation-backed assertions of the assigned right to purchase on behalf of the Peredos, the joint tenants of a single rental unit, contrary to TOPA's limitation.

The Morrisons argue, however, that notwithstanding this bifurcated (and conflicting) assertion of rights as to 1824 Lamont, the Bank had an easy remedy as to that property—one that would respect the tenants' (or their assignees') valued right to purchase—which was to strike Martha Peredo's name from the first-refusal offer of the upstairs tenants as "surplusage," leaving intact an offer to match by Laurie Morrison (holding all of the upstairs tenants' rights) untainted by any splitting of rights by Roger and herself. The Bank responds that it was not obliged to change the terms of Laurie Morrisons' contract-offer by deleting Martha Peredo's name (as tenant-assignor) from it, even if the upstairs tenants had uniformly authorized Laurie Morrison to buy the property. For the reasons next stated, we find it unnecessary to decide this question. The Lloyd contract-offer was eventually terminated, and in its place Christopher Harrison submitted one for a considerably lower purchase price—an offer the Morrisons were entitled to the opportunity to match.

### C.

■ Because the Bank properly refused to accept Laurie Morrison's offer to match the Logan/Bahn contract, Judge Bartnoff correctly ruled that Logan and Bahn may proceed on their third-party contract to buy the 1822 Lamont property. Regarding 1824 Lamont, however, the circumstances changed during this litigation: Lloyd terminated his contract-offer in early 2003, and later that year, on April 16, Christopher Harrison submitted a contract to buy 1824 Lamont for $450,000 (100,000 less than the Lloyd offer), a contract the Bank accepted on April 18. It is undisputed that the Bank did not give the Morrisons notice of that contract and thus an opportunity at the time to match it, and that they learned of the contract only during this litigation, in the course of which—in March 2005—Harrison effectively withdrew the offer to purchase.[10]

The Morrisons thus contend that, whatever infirmities may have affected their offer to match the Lloyd contract, the Bank violated TOPA by not honoring their right to match the Harrison offer by a proper offer to purchase. The Bank responds mainly by arguing that, although TOPA otherwise might have required it to

---

**10.** As noted earlier, in September 2004 Harrison had filed suit against the Bank for, *inter alia,* specific performance of the contract, but his suit was dismissed with prejudice in March 2005.

notify the 1824 Lamont tenants (and their assignees) of the Harrison contract,[11] that would have been pointless here because the Morrisons' lawsuits and the *lis pendens* "effectively barred any transfer of the property to anyone[,] including Roger or Laurie Morrison" (Br. for Bank at 3). Of course, had the Harrison offer (one considerably lower in price than the Lloyd offer) been conveyed to the Morrisons, they conceivably would have removed their legal obstacle to any transfer of the property, but the Bank makes the valid point that prejudice to the Morrisons from the failure to receive notice was somewhat self-inflicted given the pendency of Roger Morrison's legally untenable claim to the property.

Nevertheless, TOPA rights are intended to be taken seriously, and whether the Bank indeed believed that notice to the Morrisons of the Harrison contract would be futile (since "no contract could be consummated," Br. for Bank at 3) or instead simply saw the Morrisons as a nuisance to be ignored, it knew that they were the assignees of TOPA rights as to 1824 Lamont, and it was required in good faith to enable the exercise of those rights. When, after receipt of the Harrison offer in April 2003, it gave no notice of the offer until long afterwards in discovery, it exceeded any reasonable test of seasonableness in meeting its duty of notice under the statute. Although the Bank now argues that its breach and the effects thereof are moot because Harrison later—in 2005—withdrew his offer, to accept that reason for denying the Morrisons an opportunity to submit a proper offer to match that they were denied in 2003 would establish an incentive for disregard of owner obligations under a statute meant to "strengthen[ ] the legal rights of tenants...." D.C.Code § 42–3405.11. The Morrisons, we conclude, must be given the opportunity to match the Harrison contract on 1824 Lamont. How that may play out against the hypothetical assertion of the right to buy by successor tenants in the same rental unit who have assigned no rights to the Morrisons—a complexity pointed to by the Bank at oral argument—is something on which we express no opinion here.

*Affirmed in part and reversed in part.*

---

11. That concession, although only implicit in the Bank's brief, is a sound one. Although TOPA nowhere explicitly obligates an owner to furnish notice of a third-party contract, its conferral on tenants of a 15–day right of first refusal "after the tenant ... has received from the owner a valid sales contract to purchase by a third party," § 42–3404.08, would have little meaning if the owner could withhold all notice of the contract to begin with.