# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VERITION PARTNERS MASTER FUND LTD. and VERITION MULTI-STRATEGY MASTER FUND LTD., | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) | C.A. No. 11448-VCL |
| ARUBA NETWORKS, INC., | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 27, 2018
Date Decided: May 21, 2018

Stuart M. Grant, Michael J. Barry, Christine M. Mackintosh, Michael T. Manuel, Rebecca A. Musarra, GRANT & EISENHOFFER P.A., Wilmington, Delaware; *Attorneys for Petitioners*.

Michael P. Kelly, Steven P. Wood, McCARTER & ENGLISH, LLP, Wilmington, Delaware; Marc J. Sonnenfeld, Karen Pieslak Pohlmann, Laura Hughes McNally, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; *Attorneys for Respondent*.

**LASTER, V.C.**

In May 2015, Hewlett-Packard Company ("HP") acquired Aruba Networks, Inc. ("Aruba" or the "Company"). Under the merger agreement, each share of Aruba common stock was converted into the right to receive consideration of $24.67 per share, subject to the holder's statutory right to eschew the merger consideration and seek appraisal.[1] The petitioners perfected their appraisal rights and litigated this statutory appraisal proceeding.

In a post-trial memorandum opinion dated February 15, 2018, I determined that the fair value of Aruba for purposes of appraisal was $17.13 per share.[2] In reaching this conclusion, I relied heavily on the Delaware Supreme Court's recent decisions in *Dell*[3] and *DFC*.[4] As I read them, those decisions endorsed using the market price of a widely traded firm as an indicator of fair value if the market for the shares of the firm exhibited attributes associated with the premises underlying the efficient capital markets hypothesis.[5] As I read them, those decisions also endorsed using the deal price in a third-party, arm's-length transaction as an indicator of fair value, after deducting synergies from the deal price.[6] As

---

[1] *See* 8 *Del. C.* § 262.

[2] *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.* (*Post-Trial Ruling*), 2018 WL 922139, at *4 (Del. Ch. Feb. 15, 2018).

[3] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1 (Del. 2017).

[4] *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346 (Del. 2017).

[5] *See Dell*, 177 A.3d at 5, 24-27; *DFC*, 172 A.3d at 369-70, 373.

[6] *See Dell*, 177 A.3d at 21-22, 34-35; *DFC*, 172 A.3d at 367, 371.

I read them, those decisions also cautioned against relying on discounted cash flow analyses prepared by adversarial experts when reliable market indicators are available.[7]

Informed by my readings of *Dell* and *DFC*, the Post-Trial Ruling declined to give any weight to the expert valuations, which relied on discounted cash flow analyses to reach divergent results.[8] The market for Aruba's common stock exhibited attributes consistent with the premises of the efficient capital markets hypothesis,[9] so I considered Aruba's thirty-day average unaffected market price of $17.13 per share to be a reliable indicator of value.[10] I also considered the deal price to be a reliable indicator of value, but concluded that *Dell*, *DFC*, and the appraisal statute required adjustments to exclude "any element of value arising from the accomplishment or expectation of the merger."[11] Based on a study cited by the respondent's expert and synergy estimates in the record from Aruba and HP, I

---

[7] *See Dell*, 177 A.3d at 25 (describing the management buy-out in that proceeding and stating that "this appraisal case does not present the classic scenario in which there is reason to suspect that market forces cannot be relied upon to ensure fair treatment of the minority"); *DFC*, 172 A.3d at 369 n.118 (explaining that discounted cash flow models are "often used in appraisal proceedings when the respondent company was not public or was not sold in an open market check").

[8] *Post-Trial Ruling*, 2018 WL 922139, at *2, *52-53.

[9] *Id.* at *1, *25-28, *51.

[10] *Id.* at *1, *34.

[11] 8 *Del. C.* § 262(h); *see also Dell*, 177 A.3d at 20; *DFC*, 172 A.2d at 364, 368.

2

derived a midpoint valuation indication based on the deal-price-minus-synergies of $18.20 per share.[12]

I then confronted the challenge of how to harmonize, weigh, or otherwise decide between two probative yet divergent indications of fair value. Although my deal-price-minus-synergies indicator represented my best effort under the circumstances, it potentially suffered from a variety of measurement errors, raising concerns about its reliability.[13] I also concluded, based on the work of leading scholars, that my deal-price-less-synergies figure continued to incorporate an element of value derived from the merger itself: the value that the acquirer creates by reducing agency costs through the aggregation of a control position (here 100% ownership).[14] Under the appraisal statute, the petitioners should not be entitled to share in that element of value, because it "aris[es] from the accomplishment or expectation of the merger."[15] My synergy deduction compensated for the one element of

---

[12] *Post-Trial Ruling*, 2018 WL 922139, at *2, *45.

[13] *See id.* at *2, *44-45, *53-54.

[14] *See* William J. Carney & Mark Heimendinger, *Appraising the Nonexistent: The Delaware Court's Struggle with Control Premiums*, 152 U. Pa. L. Rev. 845, 847-48, 857-58, 861-66 (2003) [hereinafter *Control Premiums*]; Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. Rev. 1021, 1023-24, 1034-35, 1044, 1046-54, 1067 (2009) [hereinafter *Rationalizing Appraisal*]; Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. Penn. L. Rev. 1, 30-36, 49, 52, 60 (2007) [hereinafter *Implicit Minority Discount*]; Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 128, 132-33, 139-42 (2005) [hereinafter *Fair Value of Cornfields*].

[15] 8 *Del. C.* § 262(h); *see M.P.M. Enters., Inc. v. Gilbert* 731 A.2d 790 (Del. 1999) ("Fair value, as used in § 262(h), Is more properly described as the value of the company

3

value arising from the merger, but addressing this other aspect would require a further downward adjustment.[16] By contrast, the market value indicator did not require adjustments. Under a traditional formulation of the efficient capital markets hypothesis, the unaffected market price provides a direct indication of the value of the subject company based on its operative reality independent of the merger, at least for a company that is widely traded and lacks a controlling stockholder.[17] I therefore concluded on the facts

to the stockholder as a going concern, rather than its value to a third party as an acquisition."); *see also Rationalizing Appraisal*, *supra*, at 1038 ("[T]hird-party sale value is an inappropriate standard for determining the fair value of dissenting shares because it incorporates elements of value—associated with acquisitions of control by third parties—that do not belong to the acquired enterprise or to shares of stock in that enterprise."); *Implicit Minority Discount*, *supra*, at 30 ("The value of the firm is not its third-party sale value ($V_{3PS}$). In an arm's-length transaction, an acquirer will pay a premium to $V_E$ in purchasing the firm. The premium largely reflects synergies arising from the merger, but it can also reflect benefits of control."); *Fair Value of Cornfields*, *supra*, at 148 ("[E]xcluded gains [for purposes of appraisal] include, for example, those resulting from economies of scale or increased market share, or those that result from the acquirer's plans to operate the post-merger enterprise more efficiently."); *id.* at 151 (concluding that Section 262(h) excludes value arising from both "synergies dependent on the consummation of an arm's-length acquisition" and "operating efficiencies that arise from the acquirer's new business plans").

[16] *See Rationalizing Appraisal*, *supra*, at 1055 (discussing an acquisition of a widely held firm and explaining that "the firm's going concern value can be estimated in this case as the actual purchase price minus synergies minus control value").

[17] *See* Richard A. Booth, *Minority Discounts and Control Premiums in Appraisal Proceedings*, 57 Bus. Law. 127, 151 n.130 (2001) ("[M]arket price should ordinarily equal going concern value if the market is efficient."); *Control Premiums*, *supra*, at 857-58 ("The basic conclusion of the Efficient Capital Markets Hypothesis (ECMH) is that market values of companies' shares traded in competitive and open markets are unbiased estimates of the value of the equity of such firms."); *id.* at 879 (noting that the appraisal statute requires consideration of all relevant factors and stating that "in an efficient market, absent information about some market failure, market price is the only relevant factor"); *Implicit Minority Discount*, *supra*, at 52 ("Take the case of a publicly traded company that has no

presented that the most persuasive evidence of Aruba's fair value was its unaffected trading price of $17.13 per share.[18]

Under Court of Chancery Rule 59(f), "[a] motion for reargument setting forth briefly and distinctly the grounds therefor may be served and filed within 5 days after the filing of the Court's opinion or the receipt of the Court's decision."[19] The petitioners have moved for reargument.[20]

As movants, the petitioners bear the burden of demonstrating that I "overlooked a decision or principle of law that would have controlling effect" or "misapprehended the law or the facts so that the outcome of the decision would be affected."[21] A party moving for reargument is not permitted "to raise new arguments that they failed to present in a timely way."[22] An argument that was not previously raised "is therefore waived, and the

---

controller. Efficient market theory states that the shares of this company trade at the pro rata value of the corporation as a going concern."); *id.* at 60 ("As a matter of generally accepted financial theory . . . , share prices in liquid and informed markets do generally represent th[e] going concern value . . . .").

[18] *See Post-Trial Ruling*, 2018 WL 922139, at *4, *55.

[19] *See* Ct. Ch. R. 59(f).

[20] Dkt. 190 (the "Reargument Motion").

[21] *Miles, Inc. v. Cookson Am., Inc.*, 677 A.2d 505, 506 (Del. Ch. 1995) (quoting *Stein v. Orloff*, 1985 WL 21136, at *2 (Del. Ch. 1985)).

[22] *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 975581, at *1 (Del. Ch.) (Strine, V.C.), *aff'd*, 7 A.3d 485 (Del. 2010) (TABLE).

motion must be denied for that reason alone."[23] Rule 59 is also "not a vehicle to rehash or more forcefully present arguments already made."[24] "[T]he Court will deny a motion for reargument that does no more than restate a party's prior arguments."[25]

The Reargument Motion advances what appear to be eight grounds for reargument. In the order presented, they are:

- I misapprehended the law due to my "frustration with many of the Supreme Court's pronouncements."[26]

- I misapprehended both the law and the facts by reaching "an absurd result that no litigant would even ask for."[27]

- I misapprehended the import of the discussion of the efficient capital markets hypothesis in *Dell* and *DFC*, because "the superior tribunal simply referred to the ECMH to criticize the Court of Chancery's reliance on information that the Supreme Court deemed was known to the market as a reason for not giving substantial weight to the *deal price*."[28]

---

[23] *Id.  See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 4.09 (2015) (explaining that a "motion for reargument may not introduce any new legal theories or issues that could have been raised" but were not).

[24] *Lechiter v. Del. Dep't of Nat. Res.*, 2016 WL 878121, at *2 (Del. Ch. Mar. 8, 2016); *accord McElroy v. Shell Petroleum, Inc.*, 1992 WL 397468, at *1 (Del. Nov. 24, 1992) (TABLE) ("A motion for reargument is not intended to rehash the arguments already decided by the court.").

[25] *Zutrau v. Jansing*, 2014 WL 6901461, at *2 (Del. Ch. Dec. 8, 2014), *aff'd*, 123 A.3d 938 (Del. 2015).

[26] Reargument Mot. ¶ 1.

[27] *Id.*

[28] *Id.* ¶ 4.

- I misapprehended the facts when applying the efficient capital markets hypothesis because the trial record established that there was information about the value of Aruba that had not been incorporated into the unaffected market price.[29]

- I misapprehended the law because relying on the unaffected trading price as an indicator of value is "ridiculous."[30]

- I acted "arbitrarily and capriciously" by using a 30-day average to measure the unaffected market price rather than some other period.[31]

- I misapprehended the law and the facts because "the measuring point for the valuation is supposed to be the closing date (May 18, 2015), but the Court effectively used the 30 day period between January 26, 2015 and February 24, 2015 as the 'valuation date.'"[32]

- I violated my "oath to Delaware to uphold the Delaware Constitution"[33] by using the unaffected market price as an indicator of fair value because this means, as a practical matter, "that there can never be an appraisal for a public company receiving a premium offer, regardless of the size of that premium."[34] This approach "eliminated the statutory right to appraisal provided by the General Assembly in the context of a publicly traded company."[35]

In this decision, I take the liberty of grouping conceptually similar objections together, rather than following the order in which the petitioners presented them.

---

[29] *Id.* ¶ 5.

[30] *Id.* ¶ 7.

[31] *Id.*

[32] *Id.* ¶ 8.

[33] *Id.* ¶ 9

[34] *Id.*

[35] *Id.*

7

This decision denies the Reargument Motion. The petitioners have not shown that I misapprehended the facts or the applicable law. When preparing the Post-Trial Ruling, I reasoned through the issues as best I could and reached what I believe is the correct determination of fair value for purposes of this case. At this point, the proper institutional remedy for correcting any errors lies with the senior tribunal on appeal.

## A.    Objections To The Application Of The Legal Framework

Three of the petitioners' objections accept for the sake of argument that the Post-Trial Ruling could rely on the unaffected market price as a valuation indicator, but they assert that I misapprehended the law and the facts when doing so. These are the petitioners' most straightforward contentions, so this decision starts with them.

### 1.    The Use Of A Thirty-Day Average

The petitioners contend that I acted "arbitrarily and capriciously" by using a 30-day average to determine the unaffected market price rather than some other measurement period.[36] The petitioners claim that "[t]here is no record evidence or citation to support that choice."[37] They ask rhetorically, "Does an efficient market really take 30 days to adjust to provide evidence of fair value . . . ? Why isn't it 90 days? Why isn't it 1 day?"[38] They note that the period chosen makes a substantial difference in the outcome:

> [H]ad the Court selected 1 day, the fair value would have been $18.38; had it selected 90 days, it would have been $18.81; had it selected 120 days, it

---

[36] *Id.* ¶ 7.

[37] *Id.*

[38] *Id.*

would have been $19.51; had it selected the opening price the day HP first approached Aruba about a deal, it would have been $22.01.[39]

The petitioners' objection to the 30-day measurement period represents a new argument that is not cognizable under Rule 59(f).

During post-trial briefing and at post-trial argument, the respondent consistently argued for using Aruba's 30-day average trading price, measured before the news of a potential deal leaked, as the relevant metric for the unaffected market price.[40] The

---

[39] *Id.* ¶ 7 n.8.

[40] *See, e.g.*, Dkt. 163 at 1 ("[HP] paid $24.67 per share for [Aruba]—a significant premium over the unaffected market value of $17.13 per share."); *id.* at 3 ("Aruba's 30 day average unaffected market price was $17.13 . . . ."); *id.* at 37 ("The market for Aruba stock was a 'thick and efficient' one, such that Aruba's stock price reflected its going concern value."); Dkt. 167 at 1 ("Marcus' valuation far exceeds . . . Aruba's unaffected market value of $17.13."); *id.* at 2 ("Dages' analysis is also consistent with how the market . . . valued Aruba."); *id.* ("Aruba's share price was not, as Verition contends, trading in an [sic] 'trough,' but reflected an efficient market's concerns about Aruba's future." (internal citations omitted)); *id.* at 6 ("Verition . . . does not contend that the market for Aruba's stock was not efficient."); *id.* (arguing that Aruba had positive and negative aspects, "all of which the market knew and incorporated into Aruba's stock price"); Dkt. 174 at 1 ("[*DFC*] confirms Aruba's position that the Court should reject Verition's proposed DCF fair value of $32.57 and adopt Aruba's proposed DCF fair value of $19.75 because the latter is consistent with . . . Aruba's pre-transaction trading price of $17.13 . . . ."); *id.* ("*DFC* makes clear that Aruba's pre-transaction trading price is relevant to fair value and negates certain of Verition's challenges to the deal process."); *id.* ("[T]he fact that the market for Aruba stock is informationally efficient refutes Verition's argument that the deal price was negotiated while Aruba traded in an artificial 'trough.'"); *id.* at 3 ("*DFC* Shows That Aruba's Market Price Of $17.13 Is Informative Of Fair Value."); *id.* at 15 (arguing that the court should consider "the market price"); Dkt. 178 at 97-98 ("I would submit that these four numbers, Aruba's unaffected contemporaneous market price of [$]17.13 a share, the merger price of [$]24.67 a share as a ceiling, and HP's valuation . . . of Aruba at [$]19.10 a share, and the DCF valuation of Mr. Dages of no greater than [$]19.75 a share, all cluster around the same valuation range."); *id.* at 98-104 (discussing relevance of unaffected market price of $17.13 per share as indicator of fair value); Dkt. 188 at 1 ("[*Dell*] confirms Aruba's position that the Court must consider Aruba's pre-transaction market price of

9

respondent did not bury the lede: Aruba identified this metric in the opening lines of every one of its post-trial briefs, and its counsel mentioned it at the outset of his argument during the post-trial hearing.[41]

The petitioners never contested the 30-day metric, nor did they offer a different one. They took the broader position that Aruba's market price was depressed and unreliable. The petitioners could have engaged on the proper measurement period for market value by

---

$17.13 as both an independent indicator of Aruba's fair value and as a reliable anchor for the $24.67 merger price less shared synergies."); *id.* at 2 ("[T]he Court should consider Dages' imminently reasonable $19.75 DCF as yet another check that confirms the reliability of the $17.13 market price, and reject Marcus' $32.57 DCF as there is no rational, factual basis for the 90% valuation gap between this and the market price."); *id.* at 14 (arguing for reliance on "Aruba's 30-day unaffected market price of $17.13").

[41] *See, e.g.*, Dkt. 163 at 1 (respondent's answering post-trial brief: "[HP] paid $24.67 per share for [Aruba]—a significant premium over the unaffected market price of $17.13 per share."); Dkt. 167 at 1 (respondent's post-trial sur-reply brief: "Marcus' valuation far exceeds . . . Aruba's unaffected market value of $17.13."); Dkt. 174 at 1 (respondent's supplemental post-trial brief on *DFC*: "[*DFC*] confirms Aruba's position that the Court should reject Verition's proposed DCF fair value of $32.57 and adopt Aruba's proposed DCF fair value of $19.75 because the latter is consistent with . . . Aruba's pre-transaction trading price of $17.13 . . . ."); Dkt. 178 at 97-98 (respondent's counsel beginning his argument during the post-trial hearing: "I would submit that these four numbers, Aruba's unaffected contemporaneous market price of [$]17.13 a share, the merger price of [$]24.67 a share as a ceiling, and HP's valuation . . . of Aruba at [$]19.10 a share, and the DCF valuation of Mr. Dages of no greater than [$]19.75 a share, all cluster around the same valuation range."); *id.* at 98-104 (discussing relevance of unaffected market price of $17.13 per share as indicator of fair value); Dkt. 188 at 1 (respondent's supplemental post-trial brief on *Dell*: "[*Dell*] confirms Aruba's position that the Court must consider Aruba's pre-transaction market price of $17.13 as both an independent indicator of Aruba's fair value and as a reliable anchor for the $24.67 merger price less shared synergies."); *id.* ("[I]n response to the Supreme Court's recent guidance in *Dell* and [*DFC*], Aruba now understands that its pre-transaction market price is indeed the single most important mark of its fair value." (footnote omitted)).

noting that they believed that the market price was unreliable, but that if the court disagreed and chose to consider that metric, then the court should use a different measurement period. Parties often make alternative arguments of this type. Rather than engaging in this manner, the petitioners did not advocate in favor of any metric for market value. Even now, the Reargument Motion does not argue that the court should have used a particular measurement period. The Reargument Motion simply observes that different measurement periods could produce different valuation indications.

Had the petitioners engaged on the measurement period, then the respondent doubtless would have provided support for the 30-day metric. In response to the Reargument Motion, the respondent has cited authorities indicating that using a 30-day period is both "generally considered acceptable in the financial community"[42] and within a court's discretionary judgment.[43] I would have considered the parties' competing

---

[42] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712 (Del. 1983); *see* Dkt. 192 ¶ 9 n.8 (citing Arthur J. Keown & John M. Pinkerton, *Merger Announcements and Insider Trading Activity: An Empirical Investigation*, 36 J. Fin. 855, 866 (1981) for the proposition that "a 30-day average has the benefit of correcting for 'what appears to be common knowledge on the street: impending merger announcements are poorly held secrets'"). Given the strictures of Rule 59(f) and the fact that the petitioners had not previously raised the issue, I have not delved into the valuation and academic literature on this point, but I suspect many treatises and other articles could be cited to support the general acceptance of a 30-day average as a common metric for calculating the unaffected trading price.

[43] *See, e.g.*, *In re Appraisal of Shell Oil Co.*, 1990 WL 201390, at *29 (Del. Ch. Dec. 11, 1990) (explaining that it "was not improper, as a matter of law," to base the unaffected market price on either "the day prior to the offer announcement" or a day "30 days prior to the merger announcement"), *aff'd*, 607 A.2d 1213 (Del. 1992); *In re Olivetti Underwood Corp.*, 246 A.2d 800, 805 (Del. Ch. 1968) (declining to recognize any rule of law mandating a particular measurement period and finding that an average was reasonable).

arguments, and perhaps there would have been good reason to choose a different period. But the petitioners did not engage on how long the measurement period should be. They chose to reject market value entirely. For the petitioners to dispute the proper measurement period now constitutes a new argument that is beyond the scope of Rule 59(f).

The petitioners also point out that I did not provide a footnoted record citation for the source of the 30-day average. This argument presents a somewhat different point than their objection to the 30-day average because the petitioners could not have raised this omission before seeing the Post-Trial Ruling.

Because the 30-day measurement period permeated the briefing, it did not occur to me to provide a footnoted record citation to support it. It appeared uncontested that if I adopted market value as a metric, then the 30-day average was an appropriate measurement period and $17.13 per share was the relevant figure. The Post-Trial Ruling spanned 129 pages and was encumbered by 498 footnotes. In my view, the omission of a 499th footnote does not rise to a misapprehension of fact sufficient to warrant reargument.

## 2.    The Gap Between The Market Indication And The Valuation Date

The petitioners next contend that I misapprehended the law because "the measuring point for the valuation is supposed to be the closing date (May 18, 2015), but the Court effectively used the 30 day period between January 26, 2015 and February 24, 2015 as the 'valuation date.'"[44] I did not misapprehend the law regarding the valuation date or miss the

---

[44] Reargument Mot. ¶ 8.

12

fact that using earlier market measures resulted in a temporal gap between the evidence of value and the valuation date. The Post-Trial Ruling considered the issue explicitly,[45] just as I have done in other appraisal decisions.[46]

The Post-Trial Ruling found that "neither side proved that Aruba's value had changed materially by closing, so this decision sticks with the unaffected market price and the deal price less synergies."[47] As support for the legitimacy of this determination, the Post-Trial Ruling cited Chief Justice Strine's decision in the *Union Illinois* case, issued while he served on this court, in which he reached a similar conclusion regarding the insignificance of the temporal gap based on the record presented in that matter.[48]

The petitioners have not shown that I misapprehended the law or facts as to the temporal gap. They simply disagree with the finding made in the Post-Trial Ruling. That disagreement gives rise to an issue for appeal, not grounds for reargument.[49]

---

[45] *Post-Trial Ruling*, 2018 WL 922139, at *53.

[46] *See Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *23-26 (Del. Ch. Dec. 16, 2016); *In re Appraisal of Dell Inc.* (*Dell Trial Fair Value*), 2016 WL 3186538, at *21 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part sub nom. Dell,* 177 A.3d 1.

[47] *Post-Trial Ruling*, 2018 WL 922139, at *53.

[48] *See Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp. Ltd.*, 847 A.2d 340, 358 (Del. Ch. 2004) (describing the temporal gap as a "quibble" and "not a forceful objection").

[49] *See Zutrau*, 2014 WL 6901461, at *2 (finding "[m]ere disagreement with the Court's resolution of a matter" to be insufficient grounds for reargument.).

13

### 3. The Existence Of Information That Was Not Known To The Market

The petitioners also contend that I misapprehended the facts when applying the efficient capital markets hypothesis as framed in *Dell* and *DFC* because the trial record established that there was information about the value of Aruba that was undisclosed and could not have been incorporated into the unaffected market price.[50] The petitioners contend that by using the 30-day unaffected market price, the Post-Trial Ruling effectively adopted the strong form of market efficiency rather than the semi-strong form that the *Dell* and *DFC* decisions endorsed.[51]

I agree that the Delaware Supreme Court's decisions in *Dell* and *DFC* endorsed a traditional version of the semi-strong form of the efficient capital markets hypothesis, not the strong form.[52] Under the semi-strong version, information concerning a company is quickly impounded into the company's stock price such that the price reflects the information. The semi-strong form of the hypothesis differs from the strong form, in which stock prices reflect all information relevant to value, both public and nonpublic.[53]

---

[50] Reargument Mot. ¶ 5.

[51] *Id.* ¶ 4.

[52] *See, e.g.*, *Post-Trial Ruling*, 2018 WL 92139, at \*24 ("The Delaware Supreme Court's recent decisions in *DFC* and *Dell* teach that if a company's shares trade in a market having attributes consistent with the assumptions underlying a traditional version of the semi-strong form of the efficient capital markets hypothesis, then the unaffected trading price provides evidence of the fair value of a proportionate interest in the company as a going concern." (footnote omitted)); *see also id.* at \*25, \*30, \*31 n.207, \*34.

[53] *See generally* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

14

The petitioners now argue that I found that there was information that was not impounded into the trading price. In the Post-Trial Ruling, I made the following findings about Aruba's release of information to the market:

> At the end of January 2015, HP offered to acquire Aruba for $23.25 per share. During the first week of February, while Aruba was considering its response, another analyst report criticized the Company, and the stock price fell again, closing around $16.07 the day after the report. Contrary to the market's perception, Aruba management knew internally that Aruba was having an excellent quarter and would beat its guidance. But, rather than correcting the market's perception, Aruba management proposed to time the announcement of the merger to coincide with the announcement of Aruba's February 2015 earnings. Companies often announce significant items as part of an earnings release, particularly if the earnings are bad and the news is good (or vice versa). In this case, Aruba management believed that an increase in the stock price would hurt their chances of getting the deal approved. Providing both pieces of information simultaneously would blur the market's reaction to Aruba's strong quarterly results and help get the deal approved.[54]

I noted that after Aruba announced its strong quarterly results in conjunction with the merger, "Aruba's stock traded briefly above the deal price, indicating the market took into account both the announcement of the deal and Aruba's strong results."[55]

As with the measurement period, the petitioners could have used the conjunctive announcement as an opportunity to engage with the respondent's proffered measure of the unaffected market price and argue for a higher figure. Had they done so, then in my view the respondent would have had a strong argument that to the extent the market price reacted to news of the deal, the resulting valuation impact represented an "element of value arising

---

[54] *Post-Trial Ruling*, 2018 WL 922139, at *33 (footnotes omitted).

[55] *Id.* at *34.

from the . . . expectation of the merger."[56] That argument would have forced the petitioners to try to disentangle the effect of the earnings information from the effect of the merger announcement.[57]

The petitioners did not make the attempt. Instead, they argued broadly that the market price was unreliable and should be disregarded because investors were undervaluing Aruba. The Post-Trial Ruling considered that argument and rejected it.[58]

For the petitioners now to argue that I should have constructed and considered a different market price constitutes a new argument. It does not provide a basis for relief under Rule 59(f).

## B. Objections To The Interpretation Of *Dell* And *DFC* That Created The Legal Framework

The petitioners' next three objections disagree with the Post-Trial Ruling's reliance on Aruba's unaffected market price as a valuation indicator. They contend that the Post-Trial Ruling misapprehended the import of the Delaware Supreme Court's rulings in *Dell* and *DFC* and should not have considered the unaffected market price. This is logically the next set of arguments to tackle.

---

[56] 8 *Del. C.* § 262(h).

[57] *See Post-Trial Ruling*, 2018 WL 922139, at \*35 (noting that "[r]eleasing information simultaneously or in close proximity might make it difficult for an expert to disentangle the price reaction").

[58] *See id.* at \*28-34.

### 1.     Whether *Dell* And *DFC* Meant To Endorse The Efficient Capital Markets Hypothesis As A Valuation Tool

The petitioners argue that the Post-Trial Ruling misapprehended the import of the discussion of the efficient capital markets hypothesis in *Dell* and *DFC*, because neither decision "required the Court of Chancery to weight the supposedly 'unaffected' market trading price *at all.*"[59] Rather, the petitioners say that "the superior tribunal simply referred to the ECMH to criticize the Court of Chancery's reliance on information that the Supreme Court deemed was known to the market as a reason for not giving substantial weight to the *deal price.*"[60]

I agree that *Dell* and *DFC* did not *require* the Court of Chancery to give weight to the unaffected market price. The Post-Trial Ruling did not proceed on the premise that I was required to give weight to the unaffected market price, nor did I ultimately give exclusive weight to the unaffected market price because I thought I was required to do so.

Instead, I perceived that *Dell* and *DFC* endorsed the reliability of the unaffected market price as an indicator of value, at least for a widely traded company, without a controlling stockholder, where the market for its shares has attributes consistent with the assumptions underlying the efficient capital markets hypothesis. As a result, I believe that trial courts now can (and often should) place heavier reliance on the unaffected market price.

---

[59] Reargument Mot. ¶ 6.

[60] *Id.* ¶ 4.

From my standpoint, this aspect of the *Dell* and *DFC* decisions represented a change in direction for Delaware appraisal law. Before *Dell* and *DFC*, my conceptual framework for approaching the determination of fair value called for regarding the trading price with skepticism, while having relatively greater confidence in the contemporaneous views of management and other sophisticated parties and placing relatively greater reliance on management projections prepared in the ordinary course of business. This skeptical approach to market prices did not flow from any personal value judgment on my part, but rather from how Delaware Supreme Court decisions had treated the unaffected trading price as a valuation indicator.[61]

The relatively diminished role of the market price in this conceptual framework also influenced the circumstances under which I perceived that the deal price would provide reliable evidence of fair value. While recognizing the potential relevance of that indicator, I believed that if contemporaneous evidence from knowledgeable insiders indicated that

---

[61] *See, e.g.*, *Cede & Co. v. Technicolor, Inc.* (*Technicolor II*), 684 A.2d 289, 301 (Del. 1996) (observing, in context of appraisal of publicly traded company following arm's-length deal, that the "market price of shares may not be representative of fair value" (internal quotation marks omitted) (quoting *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1150 n.12 (Del. 1989))); *Rapid-American Corp. v. Harris*, 603 A.2d 796, 806 (Del. 1992) (describing the Court of Chancery's rejection of market value in *Chicago Corp. v. Munds*, 172 A. 452 (Del. Ch. 1934), and observing that "*Munds'* succinct evaluation of the market has lost none of its lustre"); *see also Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 248 (Del. 2001) (stating that if a transaction "was timed to take advantage of a depressed market, or a low point in the company's cyclical earnings, or to precede an anticipated positive development, the appraised value may be adjusted to account for those factors"). *See generally Implicit Minority Discount*, *supra*, at 8 ("Delaware appraisal law has never been particularly friendly to the idea that stock market prices always accurately represent a proportional share of the value of the enterprise as a going concern.").

the company's market price was depressed, then the party arguing for reliance on the deal price (typically the respondent) would bear the burden of showing that the process had provided a sufficient opportunity for price discovery to warrant regarding the deal price as a reliable indicator of fair value.[62] I have previously described my then-operative understandings of what this inquiry contemplated, so I will not repeat them here.[63]

As discussed in greater detail below, the Delaware Supreme Court's decisions in *Dell* and *DFC* contained an unprecedented level of discussion of the efficient capital markets hypothesis.[64] To my mind, the Delaware Supreme Court's endorsement of the

---

[62] *See M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999) ("In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence.").

[63] *See Dell Trial Fair Value*, 2016 WL 3186538, at *22-28; *Lender Processing*, 2016 WL 7324170, at *14-26.

[64] I use "unprecedented" descriptively—and without intending any pejorative connotation—to mean literally without prior Delaware Supreme Court precedent. I personally have been unable to locate a single Delaware Supreme Court decision before *Dell* and *DFC* that mentioned the efficient capital markets hypothesis by name, much less cited it with approval. Among various research efforts, I queried the Delaware cases database on Westlaw (DE-CS) with a broad search (efficient +5 market), then limited the results to Delaware Supreme Court decisions. The results consisted of nine opinions, including *Dell* and *DFC*. Of the remaining seven, three explained that uniform interpretations of standard provisions in indentures and other commercial documents promote the "efficient working of capital markets." *See Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006 L.P.*, 93 A.3d 1203, 1206 n.9 (Del. 2014) (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982)); *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 119 (Del. 2012); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del. 1996) (quoting *Sharon Steel*, 691 F.2d 1039). A fourth used the phrase when describing the defendants' rationale for proceeding with a controlling-stockholder acquisition that the plaintiffs had challenged. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1229 (Del. 2012) (noting that the defendants contended that a stock-for-stock merger would increase the number of outstanding shares, which

19

would "improve stockholder liquidity, generate more analyst exposure, and create a more efficient market for Southern Peru shares"). A fifth quoted my observation in a post-trial decision that "the reliability of an observed beta depends on an efficient trading market." *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 867 (Del. 2015) (quoting *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 108-09 (Del. Ch. 2014)).

The last two of the pre-*Dell* and *DFC* decisions involved appraisal cases. In one, the Delaware Supreme Court referred to the "efficient market" when describing the respondent's request on appeal for the creation of a presumption that the deal price equated to fair value, which the high court declined to adopt. *See Golden Telecom, Inc. v. Glob. GT LP*, 11 A.3d 214, 216 (Del. 2010) ("Supported by the arms-length nature of the merger and the efficient market price, Golden contends that the merger price indicated Golden's fair value for purposes of appraisal."). The final decision cited Eugene Fama's seminal *Efficient Capital Markets* in support of the observation that "[i]nformation and insight not communicated to the market may not be reflected in stock prices; thus, minority stockholders being cashed out may be deprived of part of the true investment value of their shares." *Cede & Co. v. Technicolor, Inc.* (*Technicolor I*), 542 A.2d 1182, 1187 n.8 (Del. 1988). The only substantive reference—*Technicolor I*—thus cut against relying on the efficient capital markets hypothesis, not in favor of it, as did the eventual outcome in that case.

In the interest of completeness, there is one pre-*DFC* decision from the Delaware Supreme Court that referred favorably to market price as a method of determining value. *See Applebaum v. Avaya, Inc.*, 812 A.2d 880 (Del. 2002). The *Applebaum* decision interpreted Section 155(2) of the Delaware General Corporation Law, which states that when a reverse stock split or other transaction generates fractional shares, a corporation may "pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined." 8 *Del. C.* § 155(2). A corporation used the market price to determine the amount due for factional shares following a reverse stock split. The Court of Chancery upheld this determination, and the Delaware Supreme Court affirmed, stating that "the Vice Chancellor properly held that the trading price of actively-traded stock of a corporation, the stock of which is widely held, will provide an adequate measure of fair value for the stockholders' fractional interests for purposes of a reverse stock split under Section 155." *Applebaum*, 812 A.2d at 883. The high court later reiterated that "[t]he Vice Chancellor correctly concluded that a well-informed, liquid trading market will provide a measure of fair value superior to any estimate the court could impose." *Id.* at 890. The court cautioned, however, that "market price is not employed in all valuation contexts," citing both the appraisal statute and *Smith v. Van Gorkom*, 488 A.2d 858, 876 (Del. 1985). *See Applebaum*, 812 A.2d at 889 & n.28.

efficient capital markets hypothesis suggested a greater (yet still non-mandatory) role for the use of market price when determining fair value.

The petitioners are correct that the structure of the Delaware Supreme Court's opinions in *Dell* and *DFC* permits the interpretation that the Delaware Supreme Court only discussed the efficient capital markets hypothesis *en route* to endorsing a deal-price-less-synergies metric and that the discussion might carry no weight for purposes of assessing market price as a separate valuation indicator. Both *Dell* and *DFC* follow the same broad structure. First, the opinions discussed the efficient capital markets hypothesis. Second, they discussed the sale processes and held that the processes provided sufficiently reliable evidence of fair value that it constituted an abuse of discretion for the trial judge not to have given that indicator greater weight. Third, for completeness, they worked through challenges to the discounted cash flow analyses. Finally, they remanded the cases so that the trial court could consider giving greater weight to the deal price.

Because of this high-level structure, it is possible to read the decisions as discussing the efficient capital markets hypothesis only instrumentally in support of a deal-price-less-synergies metric. I personally considered that possibility, but after multiple readings of *Dell* and *DFC*, several factors convinced me that something more was at work.

First, discussing the efficient capital markets hypothesis did not appear to be logically necessary at the appellate level in either *Dell* or *DFC*. To endorse the deal price as a valuation indicator, the Delaware Supreme Court could have started and finished by discussing the deal process itself and explaining why market forces generated a reliable price. The *DFC* court cited a series of Court of Chancery decisions that had given exclusive

21

weight to the deal price.[65] These decisions focused on whether the deal price resulted from a "proper transactional process."[66] None of the cited decisions discussed the efficient capital markets hypothesis. Only one—*Autoinfo*—considered an argument that the market price was unreliable because the company "was thinly traded and lacked financial analyst coverage."[67] In addressing this argument, the court discussed the sale process and noted that the resulting deal generated a premium of 22% over the closing price on the last trading day before the announcement of the merger. The court concluded that "[w]hile the market may have been uninformed about AutoInfo before the sale process, it subsequently gained ample information."[68]

The Delaware Supreme Court could have followed a similar course in *Dell* and *DFC* by focusing on the reliability of the sale process without discussing the efficient capital

---

[65] *See DFC*, 172 A.3d at 364 n.84 (citing *In re PetSmart, Inc.*, 2017 WL 2303599 (Del. Ch. May 26, 2017); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771 (Del. Ch. Oct. 21, 2015); *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443 (Del. Ch. June 30, 2015); *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417 (Del. Ch. Apr. 30, 2015); *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726 (Del. Ch. Jan. 30, 2015); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807 (Del. Ch. Nov. 1, 2013); *Union Ill.*, 847 A.2d 340).

[66] *Ramtron*, 2015 WL 4540443, at *20; *accord PetSmart*, 2017 WL 2303599, at *31; *see also BMC*, 2015 WL 6164771, at *17 ("robust, arm's-length sales process"); *Ancestry.com*, 2015 WL 399726, at *16 ("[T]he process here . . . appears to me to represent an auction of the Company that is unlikely to have left significant stockholder value unaccounted for.").

[67] 2015 WL 2069417, at *12.

[68] *Id.*

markets hypothesis or the general reliability of market prices.[69] Instead, the high court chose to endorse those propositions. To my mind, these aspects of the high court's decision carried independent doctrinal significance. Moreover, the analytical move seemed particularly meaningful because it represented a departure from prior Delaware Supreme Court precedent, which had not previously endorsed the efficient capital markets hypothesis and had expressed skepticism about the reliability of market prices.[70]

Second, the opinions in *Dell* and *DFC* did not just mention the efficient capital markets hypothesis in passing. Both devoted considerable space to the subject, and both seemed quite forceful in their endorsement of market prices as an indicator of value. Here are a selection of quotations from *Dell* and *DFC* that contributed to my impressions on these points:

- "[T]he Court of Chancery's analysis ignored the efficient capital market hypothesis long endorsed by this Court."[71]

- "[The efficient capital markets hypothesis] teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view

---

[69] *See, e.g.*, *DFC*, 172 A.3d at 366 ("[W]e have little quibble with the economic argument that the price of a merger that results from a robust market check, against the back drop of a rich information base and a welcoming environment for potential buyers, is probative of the company's fair value."); *id.* ("[O]ur refusal to craft a statutory presumption in favor of the deal price . . . does not in any way signal our ignorance to the economic reality that the sale value resulting from a robust market check will often be the most reliable evidence of fair value . . . .").

[70] *See supra* notes 61-64 and accompanying text.

[71] *Dell*, 177 A.3d at 24.

of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."[72]

- "[T]he [efficient market hypothesis] states that the market assessment of value is more accurate, on average, than that of any individual, including an appraiser."[73]

- "Market prices are typically viewed superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares."[74]

- When the market for a company's shares is efficient, "a company's stock price 'reflects the judgments of many stockholders about the company's future prospects, based on public filings, industry information, and research conducted by equity analysts.'"[75]

- When the market for a company's shares is efficient, "a mass of investors quickly digests all publicly available information about a company, and in trading the company's stock, recalibrates its price to reflect the market's adjusted, consensus valuation of the company."[76]

- "As one textbook puts it, '[i]n an efficient market you can trust prices, for they impound all available information about the value of each security.'"[77]

- "'For many purposes no formal theory of value is needed. We can take the market's word for it.'"[78]

---

[72] *Id.*

[73] *DFC*, 172 A.3d at 367 n.104 (alterations in original) (internal quotation marks omitted) (quoting Bradford Cornell, *Corporate Valuation* 47 (1999)).

[74] *Id.* at 369-70.

[75] *Dell*, 177 A.3d at 25 (quoting *DFC*, 172 A.3d at 373-74).

[76] *Id.* (citing *DFC*, 172 A.3d at 370).

[77] *DFC*, 172 A.3d at 370 (alteration in original) (quoting Richard A. Brealey et al., *Principles of Corporate Finance* 373 (2008)).

[78] *Id.* (quoting Brealey et al., *supra*, at 13).

- "[T]he relationship between market valuation and fundamental valuation has been strong historically."[79]

- "[C]orporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading value of its stock—can be subject to close examination and bidding by many humans with an incentive to estimate its future cash flows value, the resulting collective judgment as to value is likely to be highly informative and that, all estimators having equal access to information, the likelihood of outguessing the market over time and building a portfolio of stocks beating it is slight."[80]

- "[I]t is unlikely that a particular party having the same information as other market participants will have a judgment about an asset's value that is likely to be more reliable than the collective judgment of value embodied in a market price."[81]

- Although the market price may not always be right, "one should have little confidence she can be the special one able to outwit the larger universe of equally avid capitalists with an incentive to reap rewards by buying the asset if it is too cheaply priced."[82]

- "[O]n average, market forecasts and market valuations will be at least as accurate as those produced by individual investors and appraisers, no matter how expert."[83]

- "Like any factor relevant to a company's future performance, the market's collective judgment of the effect of regulatory risk may turn out to be wrong, but established corporate finance theories suggest that the collective judgment of the many is more likely to be accurate than any individual's guess."[84]

---

[79] *Id.*

[80] *Id.*

[81] *Id.* at 367.

[82] *Id.*

[83] *Id.* at 373 n.144 (alteration in original) (internal quotation marks omitted) (quoting Cornell, *supra*, at 47).

[84] *Id.* at 349.

In *Dell*, after describing Dell's market capitalization, public float, weekly trading volume, bid-ask spread, and analyst coverage and the response to the news of the buyout offer, the high court observed that "[b]ased on these metrics, the record suggests the market for Dell stock was semi-strong efficient, meaning that the market's digestion and assessment of all publicly available information concerning Dell was quickly impounded into the Company's stock price."[85] In its legal analysis, the Delaware Supreme Court returned to and reiterated these points, stressing that the market for Dell's shares was efficient and that it was error to discount the trading price.[86] To my mind, this degree of emphasis did not seem solely instrumental, but rather independently important.

Third and more generally, the Delaware Supreme Court stressed in both *Dell* and *DFC* that the trial courts must take into account accepted financial and economic principles. This mandate applies to the trial court's factual findings.[87] It extends to the trial

---

[85] *Dell*, 177 A.3d at 7.

[86] *Id.* at 25-27.

[87] *See DFC*, 172 A.3d at 372 ("Although the Court of Chancery has broad discretion to make findings of fact, those findings of fact have to be grounded in the record and reliable principles of corporate finance and economics."); *id.* ("[T]he Chancellor found that the deal price was unreliable because DFC was in a trough with future performance dependent upon the outcome of regulatory actions, *but he cited no economic literature* to suggest that markets themselves cannot price this sort of regulatory risk." (emphasis added)); *see also Dell*, 177 A.3d at 24 ("We consider each of these premises in turn and find them untenable in view of the Court of Chancery's own findings of fact as considered in light of established principles of corporate finance."); *id.* at 30-31 (describing trial court's finding that the Dell sale process only involved private equity bidders and therefore had attributes of a common value auction, which in turn affected price, as "not grounded in accepted financial principles").

court's choice of valuation methodologies.[88] And it encompasses the final determination of fair value.[89] As the Delaware Supreme Court repeatedly emphasized in *Dell* and *DFC*, the efficient capital markets hypothesis is a widely accepted principle in corporate finance.[90] It follows that a trial court would be obligated to consider the valuation

---

[88] *See Dell*, 177 A.3d at 22 ("[W]hatever route it chooses, the trial court must justify its methodology (or methodologies) according to the facts of the case and relevant, accepted financial principles."); *see also id.* at 5 (explaining that the trial court "erred because its reasons for giving [the stock price and the deal price] no weight—and for relying instead exclusively on its own discounted cash flow ('DCF') analysis to reach a fair value conclusion of $17.62—do not follow from the court's key factual finding and from relevant, accepted financial principles"); *id.* at 6 ("[T]he trial court's decision to rely 'exclusively' on its own DCF analysis is based on several assumptions that are not grounded in relevant, accepted financial principles.").

[89] *See DFC*, 172 A.3d at 388 ("[T]he Court of Chancery must exercise its considerable discretion while also explaining, with reference to the economic facts before it and corporate finance principles, why it is according a certain weight to a certain indicator of value."); *see also Dell*, 177 A.3d at 5-6 ("We defer to the trial court's fair value determination if it has a 'reasonable basis in the record and in accepted financial principles relevant to determining the value of corporations and their stock.'" (quoting *DFC*, 172 A.3d at 348-49)); *DFC*, 172 A.3d at 349 (explaining that trial court erred when giving one-third weight to the deal price where "economic principles suggest that the best evidence of fair value was the deal price").

[90] *See, e.g.*, *DFC*, 172 A.3d at 349 ("[E]stablished corporate finance theories suggest that the collective judgment of the many [in a market] is more likely to be accurate than any individual's guess."); *id.* at 366 & n.104 (collecting valuation treatises to support proposition that "in any assessment of the economic value of something—be it a company, a product, or a service—economics teaches that the most reliable evidence of value is that produced by a competitive market"); *id.* at 366 n.104 ("Most of us economists who believe in this efficient market theory do so because we view markets as amazingly successful devices for reflecting new information rapidly and, for the most part, accurately." (quoting Burton G. Malkiel, *Are Markets Efficient?*, Wall St. J., Dec. 28, 2000); *id.* at 367 (noting that the fair value of the petitioners' shares "would, to an economist, likely be best reflected by the prices at which their shares were trading as of the merger"); *id.* at 370 ("[C]orporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading value of its stock—can be subject to close examination and bidding by many

implications of a stock price generated by a market having attributes consistent with the efficient capital markets hypothesis.

Fourth, particularly in *Dell*, the Delaware Supreme Court appeared to regard my failure to give weight to the stock price as a separate and distinct source of error. If the petitioners' instrumentalist view were correct, one would expect the Delaware Supreme Court to have stressed my giving inadequate weight to the deal price (the root cause of the error) and to have placed less emphasis on the market price (the instrumental error). Instead, the Delaware Supreme Court prominently discussed *both* as sources of error.[91]

_____

humans with an incentive to estimate its future cash flows value, the resulting collective judgment as to value is likely to be highly informative . . . .").

[91] *See Dell*, 177 A.3d at 5 ("The problem with the trial court's opinion is not, as the Company argues, that it failed to take into account the stock price and deal price. The trial court *did consider* this market data. It simply decided to give it no weight. But the court nonetheless erred because its reasons for giving that data no weight . . . do not follow from the court's key factual findings and from relevant, accepted financial principles."); *id.* at 34 ("The actual facts concerning Dell's market values—the particularities of its stock market and the sale process—demonstrate that the court of Chancery's reasons for assigning no weight to the market values are flawed."); *id.* at 35 (citing list of factors, including "the evidence of market efficiency," that results in the trial-level outcome in *Dell* "abus[ing] even the wide discretion afforded the Court of Chancery in these difficult cases"); *id.* (citing as error the decision "to give no weight to the prices resulting from the actions of Dell's stockholders and potential buyers").

That said, it bears noting that at one point the *Dell* opinion did describe the stock market error instrumentally, stating: "In short, the record does not adequately support the Court of Chancery's conclusion that the market for Dell's stock was inefficient and that a valuation gap in the Company's market trading price existed in advance of the lengthy market check, *an error that contributed to the trial court's decision to disregard the deal price.*" *Id.* at 27 (emphasis added). To reiterate, I agree that one possible reading of *Dell* and *DFC* would treat the discussion of the efficient capital markets hypothesis as merely an instrumental step along the road to reliance on the deal price. For the reasons I have

28

Most significantly, the Delaware Supreme Court specifically identified the failure to give weight to the market price as a standalone source of error because the market price itself provided evidence of fair value: "Here, the trial court gave no weight to Dell's stock price because it found its market to be inefficient. But the evidence suggests that the market for Dell's shares was actually efficient and, therefore, likely a possible proxy for fair value."[92] This language appeared to me to recognize explicitly that when the market for a company's shares has attributes associated with the premises underlying a traditional view of the efficient capital markets hypothesis, and the company lacks a controlling stockholder, then the stock market price is "likely a possible proxy for fair value."[93]

Finally, as a matter of policy, I was aware that some commentators have expressed concern about a regime that incentivizes appraisal arbitrage and have contended that the statutory interest rate permits appraisal arbitrageurs to generate outsized profits with minimal risk, because the fair value determination often comes in at the deal price or slightly below it.[94] The *Dell* and *DFC* decisions appeared to me to be taking steps to

---

outlined, I concluded that the discussion of the efficient capital markets hypothesis carried independent doctrinal weight.

[92] *Id.* at 6.

[93] *Id.*

[94] *See generally* Charles K. Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. Corp. L. 109, 111, 126-31 (2016) (discussing and critiquing the work of journalists, transactional lawyers, law students, and other commentators who have made this assertion). I personally find persuasive Korsmo and Myers' conclusion that the interest rate has played a minimal if nonexistent role in spurring appraisal arbitrage. Nevertheless, I acknowledge that others appear genuinely concerned about its effects.

moderate the attractiveness of appraisal arbitrage. From that standpoint, a rule that channeled outcomes towards the deal price could have the effect of bolstering the ability of arbitrageurs to benefit from the interest rate.[95] That risk would particularly afflict acquisitions by financial sponsors, where the opportunity for operational synergies is generally reduced. For the Delaware Supreme Court to open up the fair value analysis by permitting greater consideration of the unaffected market price seemed to me to be directionally consistent with and perhaps the next logical step in the path laid out by *Dell* and *DFC*.

Having considered these factors, I concluded that the discussion of the efficient capital markets hypothesis in *Dell* and *DFC* was not merely deployed instrumentally in support of a deal-price-less-synergies metric, but rather was intended to have independent doctrinal heft as a means of altering the traditional skepticism with which Delaware decisions have approached the stock market price when determining fair value. That conclusion represents one individual's reading of the operative decisions. For present purposes, however, the possibility that *Dell* and *DFC* had discussed the efficient capital markets hypothesis only for instrumental purposes was not something that I

---

[95] *Cf. Cooper v. Pabst Brewing Co.*, 1992 WL 208763, at *9 (Del. Ch. June 8, 1993) (observing that Delaware courts had been hesitant to rely heavily on deal price as evidence of fair value because it would "in effect make the deal price a 'floor,'" presenting stockholders "with a 'no-lose' situation if they seek an appraisal" and creating a regime in which "dissents from mergers would therefore be encouraged").

misapprehended. I was aware of that possibility and considered it when issuing the Post-Trial Ruling.

### 2. Whether Relying On The Unaffected Market Price Is Ridiculous

In a stronger variant of their argument that the Post-Trial Ruling misapprehended the import of *Dell* and *DFC*, the petitioners contend that the those decisions could not have meant what I interpreted them to mean because using the unaffected market price as evidence of fair value is "ridiculous"[96] and "absurd."[97] I do not share that view.

The main reason why the petitioners appear to denigrate my reliance on the unaffected market price is that it departs from this court's traditional approach to determining fair value, which typically relied on multiple metrics, even when appraising a publicly traded company. Indeed, it appears that the Post-Trial Ruling may be the first decision to hold that the unaffected market price was the best evidence of fair value and award that figure.

I do not dispute that the Post-Trial Ruling takes an approach that differs from prior Court of Chancery precedent. As this decision already has noted, Delaware Supreme Court decisions on appraisal that pre-dated *Dell* and *DFC* expressed skepticism about the reliability of the market price as an indicator of fair value. In my view, *Dell* and *DFC* changed things. I regarded the Delaware Supreme Court's endorsement of the efficient

---

[96] Reargument Mot. ¶ 7.

[97] *Id.* ¶ 1.

capital markets hypothesis and its emphasis on market indicators over the subjective views

of knowledgeable insiders as altering the decisional landscape and authorizing greater

reliance on market value.

If one jettisons the notion that relying on the market price just isn't done, then it is

hard to regard using the unaffected market price as ridiculous or absurd, at least for a

publicly traded firm that lacks a controlling stockholder and whose shares otherwise trade

in a market having attributes associated with the assumptions underlying the efficient

capital markets hypothesis. Reliance on market value is a technique that is "generally

considered acceptable in the financial community and otherwise admissible in court."[98]

Prominent legal scholars have recommended this approach.[99] As suggested by the sources

that the Delaware Supreme Court cited, finance scholars also endorse it.[100]

---

[98] *Weinberger*, 457 A.2d at 712.

[99] *See* Booth, *supra*, at 151 n.130 ("[M]arket price should ordinarily equal going concern value if the market is efficient."); *Control Premiums*, *supra*, at 857-58 ("The basic conclusion of the Efficient Capital Markets Hypothesis (ECMH) is that market values of companies' shares traded in competitive and open markets are unbiased estimates of the value of the equity of such firms."); *Implicit Minority Discount*, *supra*, at 52 ("Take the case of a publicly traded company that has no controller. Efficient market theory states that the shares of this company trade at the pro rata value of the corporation as a going concern."); *id.* at 60 ("As a matter of generally accepted financial theory . . . , share prices in liquid and informed markets do generally represent th[e] going concern value . . . ."); *see also Rationalizing Appraisal*, *supra*, at 1033-34 (questioning the use of market price for determining fair value where there is no public market price at all, the shares are illiquid or thinly traded, or there is a controlling stockholder, but observing that outside of these scenarios, "because financial markets are efficient, one can simply use the market price").

[100] *See DFC*, 172 A.3d at 367 n.104 ("[T]he [efficient market hypothesis] states that the market assessment of value is more accurate, on average, then that of any individual or appraiser." (alterations in original) (internal quotation marks omitted) (quoting Cornell,

32

Once the unaffected market price is no longer regarded as a disfavored metric, then it should not be problematic to rely on it exclusively. The Delaware Supreme Court has made clear that a trial court can rely on a single valuation methodology.[101] While serving on this court, Chief Justice Strine invoked a culinary metaphor to argue in favor of using one valuation technique rather than several:

> As a law-trained judge who has to come up with a valuation deploying the learning of the field of corporate finance, I choose to deploy one accepted method as well as I am able, given the record before me and my own abilities. Even if one were to conclude that there are multiple ways to come up with a discount rate, that does not mean that one should use them all at one time and then blend them together. Marc Vetri, Mario Batali, and Lidia Bastianich all make a mean marinara sauce. Is the best way to serve a good meal to your guest to cook up each chef's recipe and then pour them into a single huge pot? Or is it to make the hard choice among the recipes and follow the chosen one as faithfully as a home cook can? This home cook will follow the one recipe approach and use the recipe endorsed by Brealey, Myers and Allen and the mainstream of corporate finance theory taught in our leading academic institutions . . . .[102]

---

s*upra*, at 47)); *id.* at 370 ("For many purposes no formal theory of value is needed. We can take the market's word for it." (quoting Brealey et al., *supra*, at 13)); *id.* at 373 n.144 ("In an efficient market you can trust prices, for they impound all available information about the value of each security." (internal quotation marks omitted) (quoting Brealey et al., *supra*, at 373)).

[101] *See M.G. Bancorporation*, 737 A.2d at 525-26 (explaining that "in discharging its statutory mandate" to determine fair value, "the Court of Chancery has the discretion to select one of the parties' valuation models as its general framework or to fashion its own" and that it is "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record").

[102] *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *18 (Del. Ch. July 18, 2012), *aff'd sub nom. Orchard Enters., Inc. v. Merlin P'rs LP*, 2013 WL 1282001 (Del. Mar. 28, 2013) (TABLE).

In *DFC*, the Delaware Supreme Court similarly cautioned against using multiple valuation techniques, admonishing that the Court of Chancery "may well feel tempted to turn its valuation decisions into a more improvisational variation of the old Delaware Block Method, but one in which the court takes every valuation method put in the record, gives each equal weight, and then divides by the number of them."[103] The high court mandated that if the Court of Chancery relies on multiple valuation methods, it "must exercise its considerable discretion while also explaining, with reference to the economic facts before it and corporate finance principles, why it is according a certain weight to a certain indicator of value."[104] The high court admonished that "[i]n some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate."[105]

The *Dell* and *DFC* decisions observe that while the unaffected market price need not equate to fundamental value, it nevertheless generates a measure of value that is more likely to be accurate than other methodologies. "[T]he efficient market hypothesis long endorsed by this Court . . . teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst . . . ."[106]

> [C]orporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading value of its stock—can be subject to

---

[103] *DFC*, 172 A.3d at 388.

[104] *Id.*

[105] *Id.*

[106] *Dell*, 177 A.3d at 24.

close examination and bidding by many humans with an incentive to estimate its future cash flows value, the resulting collective judgment as to value is likely to be highly informative and that, all estimators having equal access to information, the likelihood of outguessing the market over time and building a portfolio of stocks beating it is slight.[107]

A single valuator, such as a trial judge conducting an appraisal, "should have little confidence she can be the special one able to outwit the larger universe of equally avid capitalists with an incentive to reap rewards by buying the asset if it is too cheaply priced."[108] And even a "market that is not perfectly efficient may still value securities more accurately than appraisers who are forced to work with limited information and whose judgments by nature reflect their own views and biases."[109] Like democracy, the unaffected market price may be imperfect, but absent proof undermining its premises, it often will be better than the other metrics that have been tried.[110]

I therefore cannot agree that using the unaffected market price as the most reliable indicator of fair value is so ridiculous or absurd as to mean that I misapprehended the law. I do not claim to have privileged insight into the high court's intent, and I may well have misunderstood the import of *Dell* and *DFC*, but that is a matter for appeal, not for a motion for reargument.

---

[107] *DFC*, 172 A.3d at 370.

[108] *Id.* at 367.

[109] *Dell*, 177 A.3d at 24 n.113 (quoting Cornell, *supra*, at 46).

[110] *Cf.* Winston Churchill, *Churchill By Himself* 574 (Richard Langworth ed., 2008)

### 3. An Outcome That No Litigant Proposed

A third reason that the petitioners regard the Post-Trial Ruling as necessarily misapprehending *Dell* and *DFC* is because it resulted in a fair value conclusion "that no litigant would even ask for."[111] The assertion that no litigant would ask for an award equal to the unaffected trading price seems limited to the facts of this case. If respondents in appraisal proceedings believe that the facts and the law can support an appraisal award equal to the unaffected trading price, they doubtless will ask for that outcome.

Limiting the assertion to the facts of this case, the respondent actually did propose that I rely on the unaffected market price.[112] In every one of its briefs, the respondent argued that Aruba's unaffected trading price of $17.13 per share was informative of fair value.[113] Moreover, in its post-trial brief on the implications of *Dell*, the respondent advanced the following proposition: "[I]n response to the Supreme Court's recent guidance in *Dell* and [*DFC*], Aruba now understands that its pre-transaction market price is indeed the single most important mark of its fair value."[114] Consequently, the respondent asserted that "the Court should find fair value to be Aruba's 30-day unaffected market price of $17.13."[115]

---

[111] Reargument Mot. ¶ 1.

[112] Dkt. 192 ¶ 3.

[113] *See supra* notes 40-43.

[114] Dkt. 188 at 1.

[115] *Id.* at 14.

But the picture is more complicated, because what really happened is that the respondent's valuation position evolved over the course of the case. As the Post-Trial Ruling explained,

> During discovery and at trial, both sides focused on their experts' discounted cash flow valuations. As the number of opinions that focused on the deal price mounted, the respondent placed greater emphasis on that metric, and the petitioners responded by attacking the process that led to the deal. After *DFC*, the respondent stressed a combination of the unaffected market price and the deal price. After *Dell*, the respondent redoubled its emphasis on the combination of the unaffected market price and the deal price.[116]

During post-trial argument, before the parties provided their supplemental submissions on *Dell*, the petitioners chastised the respondent for presenting a moving target in its valuation assertions.[117] In response, the respondent cited various valuation indications, including the unaffected market price, but counsel ultimately asserted that they were relying on their expert's updated valuation opinion of $19.75 per share as their valuation contention.[118]

Taking this history into account, I thought it reasonable when making my fair value determination to regard the respondent as bound by their contention that the minimum fair value for Aruba was $19.75 per share. Given this fact, I debated whether I should award

---

[116] *Post-Trial Ruling*, 2018 WL 922139, at *24.

[117] Dkt. 178 at 4 (petitioners' counsel: "Respondent didn't prove anything other than its ability to constantly change its valuation model to accommodate adverse litigation developments."); *id.* at 36 (describing expert's change in his valuation opinion as "a litigation-driven decision" and "advocacy"); *id.* at 64-67 (tracing changes in respondent's valuation contentions).

[118] *Id.* at 118 ("[W]e're standing behind our expert. And he says Aruba is worth [$]19.75 . . . .").

what I believed represented the most reliable estimate of fair value, or whether, notwithstanding my belief, I should award $19.75 on the theory that the respondent should be estopped from benefitting from a valuation lower than what it had endorsed.

I ultimately found persuasive the authorities which require this court to make its own, independent valuation determination.[119] I also was concerned, as a matter of policy, that to hold that a court would not go outside the range of fair value established by the parties might further incentivize parties to adopt extreme valuation positions as a means of demarcating the widest possible field in which the court could exercise its discretion.

On different facts, holding a party to its valuation contention might be warranted. For present purposes, however, because I considered the issue when issuing the Post-Trial Ruling, it does not result in a misapprehension of fact or law that would support a motion for reargument.

---

[119] *See* 8 *Del. C.* § 262(h) ("[T]he Court shall determine the fair value of the shares . . . ."); *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310-11 (Del. Ch. 2006) (Strine, V.C.) ("I cannot shirk my duty to arrive at my own independent determination of value . . . ."); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) ("When . . . none of the parties establishes a value that is persuasive, the Court must make a determination based upon its own analysis."). *See generally* Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, 38-5th C.P.S. § VI(K), at A-90 (BNA) ("If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.").

## C. Objections To My Good Faith In Rendering The Post-Trial Ruling

The petitioners' final two arguments question my good faith in issuing the Post-Trial Ruling. The short answer is that notwithstanding the petitioners' suspicions, I honestly did the best I could.

### 1. An Act Of Political Theater

The petitioners initially argue that I issued the Post-Trial Ruling as an act of political theater designed to show the Delaware Supreme Court the error of its ways. They sympathize that the Post-Trial Ruling must reflect my "frustration with many of the Supreme Court's pronouncements,"[120] only to posit that this frustration led me to pen a decision designed to show "the absurdity of the literal application of certain pronouncements made by the Supreme Court in *Dell* and *DFC* to appraisal actions."[121] They conclude that I must be engaging in a "battle of legal titans" with the Delaware Supreme Court and that the emotional fervor of intellectual combat led me to impose an unjust ruling.[122] The motion strives to remind me that the petitioners are not characters in an academic hypothetical but "real" litigants with "real dollars at stake" who should not be turned into "collateral damage."[123]

---

[120] Reargument Mot. ¶ 1.

[121] *Id.*

[122] *Id.* ¶ 9.

[123] *Id.*

Technically, this argument neither contends that I "overlooked a decision or principle of law that would have controlling effect," nor that I "misapprehended the law or the facts so that the outcome of the decision would be affected."[124] At one level, it contends that I apprehended the language of *Dell* and *DFC* too well and took it too seriously. Read fairly, however, it contends that I did not carry out the judicial task of rendering a decision based on the applicable law and the facts of the case, but rather sacrificed the petitioners' interests because of intellectual vanity. If this were true, it would seem to me to provide a legitimate basis for reargument. Indeed, in my view it would provide grounds for vacating the decision and asking the Chancellor to reassign the case to a colleague who could carry out the responsibilities of a judicial officer. Those responsibilities include that a judge "perform the duties of the office impartially and diligently"[125] and be "unswayed by partisan interests, public clamor, or fear of criticism."[126] If the petitioners were correct, then I permitted partisan intellectual interests to affect my impartiality and sway the outcome.

Recognizing that the human mind does not offer an Archimedean perch for self-assessment, I nevertheless have sought to take seriously the petitioners' assertion that I did not try in good faith to follow *Dell* and *DFC*. Rather than rejecting the petitioners' rather

---

[124] *Miles, Inc.*, 677 A.2d at 506 (quoting *Stein*, 1985 WL 21136, at *2).

[125] Del. Judges' Code Judicial Conduct Canon 2, Rule 2.5(A).

[126] *Id.*, Rule 2.4(A).

extraordinary position at face value, I have carefully re-read *DFC*, *Dell*, and other appraisal authorities, and I have re-read the Post Trial Ruling with the petitioner's concern squarely in mind.

After undertaking this process, I do not believe that that petitioner's contention is accurate. I personally do not believe that I issued the Post-Trial Ruling out of frustration. To the contrary, I personally believe that I engaged in a lengthy, laborious (in both senses), and reasoned effort to implement Delaware Supreme Court precedent.

For starters, I am not a legal titan. I am a state court trial judge. I personally do not think that the role of a trial judge accommodates active resistance to Delaware Supreme Court pronouncements. I rather view the job as calling for adherence to Delaware Supreme Court precedent. While I think it is fair game for a trial judge to suggest potential changes in the law,[127] I do not believe that a trial judge has the flexibility to disregard the Delaware Supreme Court's holdings, nor do I think that a trial judge should look for clever ways to evade their implications. When a new precedent arrives, I view my job as requiring that I update my understanding of Delaware law to incorporate the new precedent.

---

[127] I took this approach when ruling on whether certain petitioners in the *Dell* matter, were entitled to seek appraisal. Although I argued for a different rule, I applied the governing Delaware Supreme Court precedent. *Compare In re Appraisal of Dell Inc.*, 2015 WL 4313206, at *9-10 (Del. Ch. July 13, 2015) (applying existing Delaware law), *with id.* at *11 (arguing for "another possible interpretation of the Record Holder Requirement").

That is what I tried to do in this case. As this decision already has discussed at length, I made this effort when evaluating the persuasiveness of the unaffected market price.

I made a similar effort when evaluating the persuasiveness of the deal price. As discussed in the Post-Trial Ruling, the petitioners in this case proved that the sale process had flaws,[128] so it was critical for me to attempt to understand whether the deal price could be regarded as a reliable valuation indicator under the framework envisioned by *Dell* and *DFC*. From a conceptual standpoint, I imagined four hypothetical bands of deal-price reliability, ranging from the most reliable to least reliable:

- **Band 1**: A sale process is so well-constructed and well-executed that a trial court would err by not giving the deal price heavy, if not dispositive, weight.

- **Band 2**: A sale process is sufficiently good that the trial court would err by not treating the deal price as a reliable valuation indicator, but the trial court would not commit error by failing to give the deal price heavy, if not dispositive, weight.

- **Band 3**: The sale process is sufficiently flawed that the trial court could determine without erring that the deal price was not a reliable valuation indicator.

- **Band 4**: The sale process is so flawed that the trial court would err by treating the deal price as a reliable valuation indicator.

Although I have described these bands as separate domains, the lines between them necessarily will be fact-specific and fuzzy.

In this case, the petitioners argued that the sale process fell squarely into Band 4 or, at worst, in the lower range of Band 3. The respondent argued that the sale process fell

---

[128] *See Post-Trial Ruling*, 2018 WL 922139, at *36-44.

within Band 1 or, at worst, within Band 2. As I read *Dell* and *DFC*, those decisions placed the deal prices in those cases in Band 1. At the trial level in *DFC*, Chancellor Bouchard found that the sale process was sufficiently reliable to warrant consideration as a valuation indicator, and he gave it one-third weight. The Delaware Supreme Court reversed, holding that "under the conditions found by the Court of Chancery, economic principles suggest that the best evidence of fair value was the deal price."[129] Likewise in *Dell*, I found that the sale process was sufficiently reliable to exclude outlier valuations like the twice-the-deal-price figure that the petitioners advanced, and I relied on it to that extent. But I found that the sale process was not sufficiently reliable to rule out a smaller valuation discrepancy. The Delaware Supreme Court reversed, concluding that "the deal price deserved heavy, if not dispositive, weight."[130]

Because the holdings in *Dell* and *DFC* addressed when a deal price fell within Band 1, they logically did not have implications for when a sale process would be so flawed as to require placing the deal price in Band 4, nor for demarcating the boundary between Bands 4 and 3, or between Bands 3 and 2. Technically, the holdings did not even clearly delineate the border between Bands 2 and 1. The Delaware Supreme Court placed both deal prices into Band 1, but the high court might have believed the sale processes were so

---

[129] *DFC*, 172 A.3d at 349.

[130] *Dell*, 177 A.3d at 23.

good that they fell into an upper register of Band 1, without excluding the possibility that a not-as-good sale process still could generate a deal price warranting Band 1 treatment.

After I issued the Post-Trial Ruling, Vice Chancellor Glasscock issued his decision in *AOL*.[131] He derived sale process characteristics from *Dell* and declined to give any weight to a sale process that he found was not *"Dell* Compliant."[132] This outcome suggests to me that he viewed whether a transaction is "*Dell* Compliant" as demarcating the point within Band 2 at which a trial judge could opt to disregard the deal price.

I obviously did not have the benefit of *AOL* when reasoning through these issues, but I considered similar questions. After pondering *Dell* and *DFC*, those decisions seemed to me to imply that a deal price fell above the point of disregard and should be considered as a valuation indicator if the transaction did not involve a controlling stockholder and was otherwise at arm's length. This is a lower standard than the "*Dell* Compliant" concept.

I derived my lower test from a confluence of factors, including the following:

- In both *Dell* and *DFC*, the Delaware Supreme Court linked the purpose of an appraisal to whether the transaction involved a third-party buyer.
  - "[T]he purpose of an appraisal . . . is to make sure that [the petitioners] receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction."[133]

---

[131] *See In re Appraisal of AOL, Inc.*, 2018 WL 1037450 (Del. Ch. Feb. 23, 2018).

[132] *Id.* *1-2. Technically, he did give the deal price some weight in that he used it as a cross-check, *see id.* at *21, but he did not use it as an input when deriving fair value.

[133] *DFC*, 172 A.3d at 370–71.

44

- Fair value for purposes of appraisal "means a price that is one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[134]

- "[T]he key inquiry [in an appraisal] is whether the dissenters got fair value and were not exploited."[135]

- In both cases, the Delaware Supreme Court seemed to discount the importance of considering whether a different or more open sale process might have generated a higher value.

  - "[T]he purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way . . . ."[136]

  - "[F]air value is just that, 'fair.' It does not mean the highest possible price that a company might have sold for had Warren Buffett negotiated for it on his best day and the Lenape who sold Manhattan on their worst."[137]

  - "To be sure, 'fair value' does not equal 'best value.'"[138]

  - "The issue in an appraisal is not whether a negotiator has extracted the highest possible bid."[139]

- The Delaware Supreme Court placed the *Dell* transaction in Band 1 even though the transaction was a management buy-out in which Michael Dell, the eponymous founder, CEO, and largest blockholder, was a net buyer of shares.

- In *Dell*, the Delaware Supreme Court rejected as a matter of law the possibility that a sale process involving homogenous bidders operating within the confines of a

---

[134] *Id.* at 370 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).

[135] *Dell*, 177 A.3d at 33.

[136] *DFC*, 172 A.3d at 370-71.

[137] *Id.* at 370.

[138] *Dell*, 177 A.3d at 23.

[139] *Id.* at 33.

leveraged buy-out model could fall short of the valuation that would be placed on the entity by a diversified group of public owners.

Based on these factors, I concluded that although the sale process in *Aruba* had flaws, the deal price warranted consideration as a reliable valuation indicator.

My assessment of the *Aruba* sale process in light of *Dell* and *DFC* meant that I had two reliable indications of value: the unaffected market price and the deal price. At that point, I had to determine how to weigh, choose between, or otherwise evaluate the two indications. I have already described the thought process that led me to select the unaffected market price as the most reliable indicator of fair value.

I thus submit that the Post-Trial Ruling resulted from my efforts to reason through the *Dell* and *DFC* decisions and apply them to the facts presented. That said, I cannot fault the petitioners for inferring some frustration on my part. Most notably, at one point in the Post-Trial Ruling, I included a footnote detailing the record evidence that I relied on when rendering my factual finding in *Dell* about the existence of a valuation gap.[140] Having re-read this language in light of the Reargument Motion, I understand how it could sound petulant.

I did not include that footnote gratuitously. Rather, I included it to emphasize why what I regarded as the far less extensive and persuasive evidence presented in this case would not be sufficient to support a factual finding in the petitioners' favor. In the face of more extensive evidence in *Dell*, the Delaware Supreme Court had concluded that "[t]he

---

[140] *Post-Trial Ruling*, 2018 WL 822139, at *31 n.307.

record before us provides no rational, factual basis for such a 'valuation gap'"[141] and that "[t]here is also no evidence in the record that investors were 'myopic' or shortsighted."[142] As I noted in the Post-Trial Ruling, these holdings by the high court demonstrated that the justices regarded the comparatively more extensive showing in *Dell* as "the equivalent of no evidence at all."[143]

The Delaware Supreme Court reversed or criticized many other aspects of my trial level rulings in *Dell*. I did not use the Post-Trial Ruling as a platform for engaging in debate on any of those points. The footnote regarding the evidentiary basis for my finding in *Dell* was relevant to and supported my decision not to rely on weaker evidence in the Post-Trial Ruling. Nevertheless, given how it evidently came across, I should have phrased that footnote differently. If the Reargument Motion is a guide, the footnote missed its intended mark and detracted from the reasoning in the Post-Trial Ruling. That is a helpful lesson, but I do not believe that the misimpression I inadvertently created warrants granting reargument.

### 2.    Judicial Oath Breaking

The petitioners also argue that I could not have issued the Post-Trial Ruling in good faith without violating my oath as a judge. They assert that even if I believed in good faith that I was properly applying the teachings of *Dell* and *DFC* and that those decisions

---

[141] *Dell*, 177 A.3d at 25.

[142] *Id.* at 26.

[143] *Post-Trial Ruling*, 2018 WL 822139, at *31.

47

authorized a trial court to rely exclusively on the unaffected market price, I still should not have accepted that outcome because of my "oath to Delaware to uphold the Delaware Constitution, which creates three branches of government, including the legislature."[144] The petitioners claim that the Post-Trial Ruling somehow violated that oath because using the unaffected market price as an indicator of fair value would mean, as a practical matter, "that there can never be an appraisal for a public company receiving a premium offer, regardless of the size of that premium"[145] and would "eliminate[] the statutory right to appraisal provided by the General Assembly in the context of a publicly traded company."[146]

I do not agree that my reading of *Dell* and *DFC* means "that there can never be an appraisal for a public company receiving a premium offer, regardless of the size of that premium."[147] The common law develops incrementally, case by case. As the Post-Trial Ruling noted, "[p]erhaps future appraisal litigants will retain experts on market efficiency, as is common in federal securities actions, and maybe future appraisal decisions will consider subtler aspects of the efficient capital markets hypothesis."[148] Depending on the facts and the persuasiveness of the experts, future petitioners might demonstrate that the

---

[144] Reargument Mot. ¶ 9.

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Post-Trial Ruling*, 2018 WL 922139, at *24 n.257.

trading price is not a reliable indicator of value. Or perhaps future petitioners will demonstrate the existence of information that was unknown to the market and argue for a specific valuation impact. Doubtless other possibilities are possible.

Equally important, it does not violate the Delaware Constitution for the Delaware Supreme Court to interpret the appraisal statute, even if it refines the litigation target zone for petitioners in appraisal proceedings. "In our constitutional system, this Court's role is to interpret the statutory language that the General Assembly actually adopts, even if unclear and explain what we ascertain to be the legislative intent without rewriting the statute to fit a particular policy position."[149] "[T]he Constitution invests the Judiciary, not the Legislature, with the final power to construe the law."[150] The interpretation of statutory text is "one of the Judiciary's characteristic roles."[151] The Delaware courts play a particularly significant role in the corporate arena,[152] where historically the judiciary, rather

---

[149] *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 542 (Del. 2011).

[150] *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325 (1992).

[151] *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

[152] *See* Jill E. Fisch, *The Peculiar Role of the Delaware Courts in the Competition for Corporate Charters*, 68 U. Cin. L. Rev. 1061, 1074 (2000) ("Delaware corporate law relies on judicial lawmaking to a greater extent than other states."); Lawrence Hamermesh, *How We Make Law in Delaware, and What to Expect from Us in the Future*, 2 J. Bus. & Tech. L. 409, 409 (2007) [hereinafter *How We Make Law*] ("The best-known of the principal policymakers in Delaware are the members of the judiciary."); Marcel Kahan & Edward Rock, *Symbiotic Federalism and the Structure of Corporate Law*, 58 Vand. L. Rev. 1573, 1591 (2005) ("The most noteworthy trait of Delaware's corporate law is the extent to which important and controversial legal rules are promulgated by the judiciary, rather than enacted by the legislature.").

than the General Assembly, has taken the lead.[153]

For nearly seventy years, the Delaware Supreme Court has spoken authoritatively on the standard for value under the appraisal statute and the weight to be given various types of evidence within that valuation framework. The Delaware Supreme Court first addressed the governing standard of value in *Battye*,[154] then again in *Weinberger*,[155] and subsequently in decisions like *Cavalier Oil*,[156] *Rapid-American*,[157] and *Technicolor II*.[158] The high court has now continued its interpretive role in *Dell* and *DFC*.

A trial judge's oath is not a license to disregard the Delaware Supreme Court's rulings. *DFC* and *Dell* reflect authoritative statements of appraisal law. For purposes of the

---

[153] *See, e.g., How We Make Law*, *supra*, at 414 ("[W]e view the courts as the first line of defense, the first responders in dealing with complex situations. When drafting legislation, we abstain from addressing complicated matters that are hard to figure out, allowing them to develop through the common law."); Omari Scott Simmons, *Branding the Small Wonder: Delaware's Dominance and the Market for Corporate Law*, 42 U. Rich. L. Rev. 1129, 1159 (2008) ("As a result of the legislature's preference against regulatory prescription and its deference to the judicial branch, Delaware courts are often the first responders to corporate law controversies."); *see also* Lawrence A. Hamermesh & Norman M. Monhait, *A Delaware Response to Delaware's Choice*, 39 Del. J. Corp. L. 71, 75 (2014) (agreeing that the Corporation Law Council and the General Assembly "have often subscribed to . . . 'a wait-and-see approach,' proposing and enacting, respectively, amendments to the DGCL only when there are persuasive reasons to do so" and endorsing a continuing policy of "reticence to initiate legislative action" (footnote omitted)).

[154] *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

[155] *Weinberger*, 457 A.2d at 711-13.

[156] *Cavalier Oil Corp. v. Hartnett*, 564 A.2d 1137, 1144-45 (Del. 1989).

[157] 603 A.2d at 805.

[158] 684 A.2d at 296-97.

separation of powers, if the high court has moved in a direction contrary to the General Assembly's liking, the General Assembly can amend the appraisal statute. The dynamic interplay among the constitutional branches of government fulfills, rather than contravenes, the constitutional scheme.

## II. CONCLUSION

The Reargument Motion is denied. The parties shall cooperate in preparing a final order that will bring this case to conclusion at the trial court level.